No. 22-15815

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRANDON BRISKIN,
on behalf of himself and those similarly situated,
*Plaintiff-Appellant*,

v.

SHOPIFY INC., et al.,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California, No. 4:21-cv-06269-PJH
Hon. Phyllis J. Hamilton, United States District Judge

**BRIEF OF STATES OF NEVADA, MISSISSIPPI, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, IDAHO, ILLINOIS, INDIANA, IOWA, MAINE, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, NORTH DAKOTA, OKLAHOMA, OREGON, RHODE ISLAND, SOUTH CAROLINA, SOUTH DAKOTA, VERMONT, AND WASHINGTON. AND THE DISTRICT OF COLUMBIA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT**

LYNN FITCH
Attorney General of Mississippi
CRYSTAL UTLEY SECOY
Director, Assistant Attorney General
Consumer Protection Division
Office of Mississippi Attorney General
Post Office Box 220
Jackson, MS 39205
crystal.utley@ago.ms.gov

AARON D. FORD, ESQ.
Attorney General of Nevada
HEIDI PARRY STERN (Bar. No. 8873)
Solicitor General
JEFFREY M. CONNER (Bar No. 11543)
Chief Deputy Solicitor General
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, NV 89701
jmconner@ag.nv.gov
*Counsel for Amici States*

*(Additional counsel listed after signature block)*

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................. i

TABLE OF AUTHORITIES ..................................................... iii

INTERESTS OF AMICI CURIAE ............................................. 1

SUMMARY OF THE ARGUMENT ........................................ 3

ARGUMENT ............................................................................. 6

I.  The Differential-Excess Requirement Lacks Foundation in Supreme Court Precedent or This Court's *Mavrix* Decision. .................................................... 7

    A. *Walden* Does Not Support the Differential-Excess Rule. .......................... 8

    B. *Mavrix* Does Not Support the Differential-Excess Rule. ......................... 11

II. The Differentiatial-Excess Rule Is Inconsistent with Supreme Court Precedent. .......................................................................... 12

    A. The Supreme Court Credited Ford's Nationwide Marketing Campaign in Finding Forum States had Personal Jurisdiction. ...................................... 12

    B. Internet Transactions Are Not Accorded Special Exemptions in Supreme Court Jurisprudence. ................................................................ 14

III. The Differential-Excess Rule Could Deprive States of Any Appropriate Venue to Enforce Their Own State Law Regarding Internet Companies Doing Business Within Their Borders. ..................................................... 16

CONCLUSION ......................................................................... 20

i

CERTIFICATE OF COMPLIANCE........................................................................24

CERTIFICATE OF SERVICE ..............................................................................25

# TABLE OF AUTHORITIES

## Cases

*AMA Multimedia, LLC v. Wanat,*
970 F.3d 1201 (9th Cir. 2020) ................................................. 4, 5, 8, 9, 10, 11

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.,*
874 F.3d 1064 (9th Cir. 2017) .................................................... 4, 9

*Briskin v. Shopify, Inc.,*
87 F.4th 404 (9th Cir. 2023) ............................................... 1, 7, 8, 10

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985) ........................................................... 15

*Calder v. Jones,*
465 U.S. 783 (1984) .......................................................... 3, 4

*Doe v. WebGroup Czech Republic, a.s.,*
93 F.4th 442 (9th Cir. 2024) ................................................... 3

*Escanaba Co. v. City of Chicago,*
107 U.S. 678 (1883) .......................................................... 18

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
592 U.S. 351 (2021) ................................................. 3, 4, 5, 8, 12, 13

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California,*
463 U.S. 1 (1983) ............................................................ 19

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement,*
326 U.S. 310 (1945) .......................................................... 14

*J. McIntyre Mach., Ltd. v. Nicastro,*
564 U.S. 873 (2011) .......................................................... 17

*Janus v. Freeman*,
840 Fed. App'x 928 (9th Cir. 2020) ..................................................4

*Kulko v. Superior Court of Cal.*,
436 U.S. 84 (1978)......................................................................12

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
647 F.3d 1218 (9th Cir. 2011) ............................... 5, 7, 10, 11, 12

*Nat'l Bellas Hess, Inc. v. Dep't of Revenue of Ill.*,
386 U.S. 753 (1967)...................................................................14

*Old Republic Ins. Co. v. Cont'l Motors, Inc.*,
877 F.3d 895 (10th Cir. 2017) .......................................................4

*Quill Corp. v. North Dakota*,
504 U.S. 298 (1992).....................................................................14

*Raser Techs., Inc. v. Morgan Stanley & Co.*,
449 P.3d 150 (Utah 2019) ....................................................... 10, 11

*South Dakota v. Wayfair, Inc.*
585 U.S. 162 (2018)................................................ 4, 6, 14, 15, 16

*Walden v. Fiore*,
571 U.S. 277 (2014)..................................... 4, 5, 7, 8, 9, 10, 11, 12

*World-Wide Volkswagen v. Woodson*,
444 U.S. 286 (1980)...................................................................13

**Statutes**

28 U.S.C. § 1332......................................................................17

Miss. Code Ann. § 75-24-3(c) ......................................................18

Nev. Rev. Stat. Ann. § 598.840(5)..................................................18

Nev. Rev. Stat. Ann. §§ 603A.010, *et seq.* .............................................................17

**Other Authorities**

Walter Hellerstein, <u>Deconstructing the Debate Over State Taxation of Electronic Commerce</u>, 13 Harv. J.L. & Tech. 549, 553 (2000) ...........................................14

**Constitutional Provisions**

U.S. Const. amend. X.................................................................................................19

# INTERESTS OF AMICI CURIAE

Amici Curiae States of Nevada, Mississippi, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Hawai'i, Idaho, Illinois, Indiana, Iowa, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Vermont, and Washington, and the District of Columbia support Plaintiff-Appellant Brandon Briskin's appeal and petition for rehearing en banc, because the State of California has specific jurisdiction over the Shopify Defendants in his case. The undersigned are their respective states' chief law enforcement or chief legal officers and have authority to file briefs on behalf of the states they represent. The Amici States through their Attorneys General have a unique perspective that will aid the en banc Court.

This brief traces the doctrinal foundation of the panel's analysis—which erroneously grants websites special treatment by requiring plaintiffs prove forum contacts in differential excess compared to other forums—to its flawed origins. The Amici States join this brief because the panel's incorrect version of specific jurisdiction in the context of internet-related conduct has the potential, if followed in our jurisdictions,[1] to violate principles of comity and federalism by impeding the

---

[1] Although this Court has vacated the panel's Opinion, other defendants have cited it as authority in several actions being prosecuted by the Amici States.

1

states' rights to protect our residents through the enforcement of our statutes. As Attorneys General, we are empowered with the responsibility, and entrusted with the duty, to protect our consumers and markets from deceptive practices and unfair competition. A company purposefully, continuously, and systematically availing itself of our States' markets via the internet can be sued in the courts of our States if its contacts with our forums relate to violations of state law. This is so regardless of what continuous and systematic contacts the website may have with other forums, and regardless of whether physical goods are delivered within our borders.

## SUMMARY OF THE ARGUMENT

The Amici States are concerned that the differential-excess rule from the vacated opinion creates an improper barrier to enforcement of our own statutes on matters like consumer protection in our own courts when internet-based activity exploits our residents for commercial gain. For that reason, the Amici States take this opportunity to provide input for this Court's consideration of two important, interrelated questions this Court ordered the parties to address in supplemental briefing.[2]

A forum has specific jurisdiction over a defendant that purposefully availed itself of the privilege of conducting activities in the forum state, if defendant's contacts were more than random, isolated, or fortuitous, and if plaintiff's claims arise out of or relate to the defendant's contacts with the forum. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). This is so even without a causal connection between the defendant's forum-related contacts and the plaintiff's claims. *See, e.g., id.* at 362-63. Claims arising out of conduct on the internet should not be subjected to a different standard.

This Court has applied the *Calder*[3] effects test in cases that sound in tort. *E.g., Doe v. WebGroup Czech Republic, a.s.*, 93 F.4th 442, 452 (9th Cir. 2024); *AMA*

_____

[2] The Amici States take no position regarding the Court's third question.

*Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1208-09 (9th Cir. 2020); *Axiom Foods, Inc. v. Acerchem Int'l, Inc*., 874 F.3d 1064, 1069 (9th Cir. 2017). The scope and applicability of the 1984 *Calder* decision is debatable.[4] But the Amici States take no position here regarding its applicability to internet-related conduct. The point is that if *Calder* is applied, this Court should apply the second prong of the effects test— whether defendant's intentional conduct was "expressly aimed at the forum state"— in a manner consistent with Supreme Court jurisprudence on the effect of nationwide marketing (*Ford*),[5] and how minimum contacts are effected in the Cyber Age (*South Dakota v. Wayfair, Inc.* 585 U.S. 162 (2018)).[6]

A defendant expressly aims its conduct at a forum state when the defendant deliberately seeks to profit from uses of defendant's internet platform within the

---

[3] *Calder v. Jones*, 465 U.S. 783 (1984).

[4] The Tenth Circuit Court of Appeals questioned the reach of the effects test, opining that "the Supreme Court has recently suggested that the *Calder* effects test does not extend beyond the defamation context." *Old Republic Ins. Co. v. Cont'l Motors, Inc*., 877 F.3d 895, 916 n.34 (10th Cir. 2017) (citing *Walden v. Fiore*, 571 U.S. 277, 287 (2014)).
*Ford* addressed two product liability cases and did not apply the *Calder* effects test. A possible limitation of *Calder,* albeit one not explicitly delineated in every case, is that it applies to *intentional* torts rather than any out-of-state tortious conduct. *E.g., Janus v. Freeman*, 840 Fed. App'x 928, 930 (9th Cir. 2020).

[5] *See infra* Argument §II.A.

[6] *See infra* Argument §II.B.

forum state. Neither differential preference of the forum over other forums nor brick-and-mortar presence is required.

The Amici States agree with the standard espoused by Judge Gould:

> In determining whether there is jurisdiction, we may infer from "[t]he fact that [a defendant's] advertisements targeted [forum] residents ... that [the defendant] knows—either actually or constructively—about [the forum's] user base, and that it exploits that base for commercial gain by selling space on its website for advertisements."

*Wanat*, 970 F.3d at 1218 (Gould, J., dissenting) (citation omitted). "[E]xpress aiming is present where a defendant 'anticipated, desired, and achieved a substantial [forum] viewer base.'" *Id*. at 1220 (quoting *Mavrix Photo, Inc. v. Brand Techs., Inc*., 647 F.3d 1218, 1230 (9th Cir. 2011)).

The requirement that conduct must be differentiated from and in excess of conduct aimed at other jurisdictions is traceable to misreading of *Walden*,[7] and *Mavrix*.[8] This differential-excess requirement is inconsistent with *Ford*, which credited a national marketing campaign in its analysis of specific jurisdiction.[9] Further, to ignore *Ford*'s reasoning in the context of internet-related conduct goes

---

[7] *See infra* Argument §I.A.

[8] *See infra* Argument §I.B.

[9] *See infra* Argument §II.A.

against the Supreme Court's reasoning in *Wayfair,* which focused on effects of the Cyber Age on the economy and society.[10]

Finally, the Amici States are concerned that the adoption of the differential-excess test for personal jurisdiction could operate to deprive state attorneys general of a proper venue to enforce their respective states' consumer protection and other laws against internet-based companies. If a state cannot exercise personal jurisdiction over an online company in its own courts, states could be put in the unenviable (and unconstitutional) position of having to either sue to enforce their own laws in another sovereign state's courts or attempt to plead federal claims that trigger exclusive federal court jurisdiction. Such an extreme result could potentially operate to immunize these companies from ever facing enforcement actions from state attorneys general seeking to protect their states' citizens using their state legislative grants of authority to do so.

## ARGUMENT

The differential-excess requirement from the vacated panel opinion lacks doctrinal support. And it potentially creates an improper barrier to the Amici States relying on our own courts as a forum for enforcement of consumer protection and other important laws to address internet-based activity that exploits our residents for

---

[10] *See infra* Argument §II.B.

commercial gain, causing unnecessary tension with bedrock principles of state sovereignty and comity.

## I. The Differential-Excess Requirement Lacks Foundation in Supreme Court Precedent or This Court's *Mavrix* Decision.

The idea, that a defendant's internet-related conduct aimed at a forum must exceed its aiming at other jurisdictions, is not consistently stated in this Court's precedents. The *Briskin* Opinion[11] initially states that differentiation "or" focused dedication creating a substantial connection suffices[12] but then appears to suggest that differentiation is always needed for a substantial connection.[13] This Court should clarify that a defendant that conducts business via websites is not entitled to special jurisdictional protection by requiring that a plaintiff prove that defendant's contacts with the forum are differentiated from and in excess of defendant's contacts with any other forum.

---

[11] *Briskin v. Shopify, Inc*., 87 F.4th 404, 420 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 101 F.4th 706 (9th Cir. May 14, 2024).

[12] *See, e.g.*, *Briskin*, 87 F.4th at 420 ("What is needed, though, is some prioritization of the forum state, some differentiation of the forum state from other locations, **or** some focused dedication to the forum state which permits the conclusion that the defendant's suit-related conduct 'create[s] a substantial connection' with the forum." (citing *Walden*, 571 U.S. at 284) (emphasis added)).

[13] 87 F.4th at 420 ("And that 'substantial connection' must be something substantial beyond the baseline connection that the defendant's internet presence already creates with every jurisdiction through its universally accessible platform.").

## A.  *Walden* Does Not Support the Differential-Excess Rule.

The Opinion in *Briskin* identified *Walden* as "[t]he key authority," *see* 87 F.4th at 415, even though *Walden* was not an internet-related case. The *Walden* Court itself acknowledged that its opinion did not address "whether and how a defendant's virtual 'presence' and conduct translate into 'contacts' with a particular State," because that would be a "very different question", 571 U.S. at 290 n.9. *Ford* likewise rejected *Walden*'s application, explaining the decision's limitations.[14]

Nonetheless, *Briskin* cites *Walden* as purported support for the differential-excess rule. *Briskin*, 87 F.4th at 420 ("What is needed, though, is some prioritization of the forum state, some differentiation of the forum state from other locations, or some focused dedication to the forum state which permits the conclusion that the defendant's suit-related conduct 'create[s] a substantial connection' with the forum." (citing *Walden*, 571 U.S. at 284)). *Wanat* also repeatedly cites *Walden* for the proposition that Wanat did not expressly aim its website at the U.S. market. 970 F.3d at 1210-11. *Wanat* disregards geo-located advertisements, which the site universally applied, because "[t]o find specific jurisdiction based on this would run afoul of the Supreme Court's directive in *Walden* and impermissibly allow a plaintiff's contacts

---

[14] Characterizing *Ford*'s invocation of *Walden* as "its last resort," the *Ford* Court explained that "*Walden* has precious little to do with the cases before us," because the *Walden* defendant had never taken any act to form his own contact with Nevada. *Ford*, 592 U.S. at 370.

with the defendant and forum to drive the jurisdictional analysis." *Id*. at 1211 (quotation marks and brackets omitted) (citing *Walden*, 571 U.S. at 289).[15]

*Walden* does not support the differential-excess rule. In *Walden*, the Supreme Court reviewed whether Nevada could exercise personal jurisdiction over a Georgia police officer who seized money belonging to two airline passengers at a Georgia airport and helped draft a probable cause affidavit for the forfeiture. 571 U.S. at 279-81. The passengers, residents of California and Nevada, filed a tort action against the police officer in Nevada district court. *Id*. at 280-81. The Supreme Court determined that the lower court improperly shifted the focus of the effects of the alleged tort and the minimum contacts analysis from the defendant's contacts with the forum state to defendant's contacts with plaintiffs. *Id*. at 288-89.

When dissenting in *Wanat*, Judge Gould explains the better reading of *Walden*:

> *Walden* stands for the proposition that a defendant may not simply rely on a plaintiff's contacts with the defendant and the forum to establish personal jurisdiction. *Walden*, 571 U.S. at 289[.] That principle of due process, however, does not make a defendant immune from suit when the "'effects' of the alleged [tortious conduct] connect[ ] the defendant[ ] to [the forum], not just to the plaintiff." *Id*. at 287[.] The majority elides this important distinction, asserting that, "[t]o find specific jurisdiction based on [users in the forum receiving targeted

---

[15] *See also Axiom Foods, Inc.*, 874 F.3d at 1066, 1070 ("[f]ollowing *Walden*, ... while a theory of individualized targeting may remain relevant to the minimum contacts inquiry, it will not, on its own, support the exercise of specific jurisdiction, absent compliance with what *Walden* requires.").

advertisements] would run afoul of the Supreme Court's directive in *Walden* and 'impermissibly allow[ ] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis.'" Maj. Op. at 1211 (quoting *Walden*, 571 U.S. at 289[]).

*Wanat*, 970 F.3d at 1222 (Gould, J., dissenting).

Judge Gould further explained, in language that equally applies to social media platforms that have violated state consumer protection laws, that the website operator knows either actually or constructively about its user base, and "exploits that base for commercial gain by selling space on [the] website for advertisements." *Id.* (quoting *Mavrix*, 647 F.3d at 1230).

The Utah Supreme Court has explained *Walden*'s language—that a defendant must have contacts "with the forum State itself"[16]— has been taken out of context. *Raser Techs., Inc. v. Morgan Stanley & Co.*, 449 P.3d 150, 160 n.13 (Utah 2019). The phrase does not mean that contacts with a forum's residents, who are in the forum at the time of the contacts, are irrelevant for jurisdictional purposes, because in *Walden* **none** of the parties were in the forum when the operative events transpired.

As the Utah Supreme Court explains: "The proper question [is] whether the defendant's conduct connects him to the forum in a meaningful way." [*Walden*, 571

---

[16] Quoted in *Briskin*, 87 F.4th at 416; *Axiom*, 874 F.3d at 1068.

10

U.S. at 290]. *Raser Techs*., 449 P.3d at 160 n.13. It then explains why in *Walden*'s particular context, the connection was not meaningful:

> In other words, the defendants had contacts with Nevada residents, but these contacts were "random, fortuitous, and attenuated" such that they could not confer jurisdiction over the defendant. *Id*. at 285[.] They did not have contacts with those Nevada residents in Nevada—whether "in person or through an agent, goods, mail, or some other means." [571 U.S.] at 285[.]

Put another way, contact with a forum's residents in the forum at the time of the contacts—"whether 'in person or through an agent, goods, mail or some other means'"—**can** connect a defendant to the forum in a meaningful way.

## B. *Mavrix* Does Not Support the Differential-Excess Rule*.*

In addition to citing *Walden*, *Wanat* also relies on *Mavrix* for the conclusion that because "all users in every forum received advertisements directed to them," the contacts with the forum state did not create specific jurisdiction. 970 F.3d at 1209-11. *Mavrix* does not support this proposition.

As quoted in the *Wanat* majority opinion, *Mavrix* states that, "[n]ot all material placed on the Internet is, solely by virtue of its universal accessibility, expressly aimed at every state in which it is accessed." 647 F.3d at 231. Nonetheless, read in its entirety, *Mavrix* supports Judge Gould's dissenting opinion in *Wanat*. *See* 970 F.3d at 1220 (Gould, J., dissenting).

*Mavrix* explains that:

[W]here . . . a website with **national** viewership and scope appeals to, and profits from, an audience in a particular state, the site's operators can be said to have "expressly aimed" at that state.

We acknowledge the burden that our conclusion may impose on some popular commercial websites. But we note that the alternative proposed by Brand's counsel at oral argument—that Mavrix can sue Brand only in Ohio or Florida—would substantially undermine the "interests ... of the plaintiff in proceeding with the cause in the plaintiff's forum of choice."

*Mavrix*, 647 F.3d at 1231 (quoting *Kulko v. Superior Court of Cal.*, 436 U.S. 84, 92 (1978)) (emphasis added). Therefore, the theory that a website's nationwide scope excises it from the ordinary specific jurisdiction test—allegedly because some excess efforts must differentiate its contact with one state forum from other state forums—was rejected in *Mavrix,* which did not find "national viewership" as a justification for granting websites preferential jurisdictional treatment.

In short, the differential-excess rule is supposedly based on *Walden* and *Mavrix*, but neither decision supports the rule.

## II.  The Differential-Excess Rule Is Inconsistent with Supreme Court Precedent.

### A.  The Supreme Court Credited Ford's Nationwide Marketing Campaign in Finding Forum States had Personal Jurisdiction.

In *Ford*, the defendant, Ford, unsuccessfully argued that personal jurisdiction was lacking in the states where vehicular accidents occurred, because the cars were not purchased, designed, or manufactured in those states. 592 U.S. at 356, 361. The

Supreme Court rejected the argument that specific jurisdiction required "the company's conduct in the State had given rise to the plaintiff's claims" such that a causal link existed, finding no legal support for Ford's reading of jurisdictional precedent. *Id*. at 356, 361. If a defendant's automotive business deliberately extended to the forum (among other States), then the forum's courts could hold defendant liable for a car catching fire there—even though the car had been designed, made, and sold outside the forum State. *Id*. at 363 (discussing *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)). This is because, "a company thus purposefully availing itself of the [forum] auto market has clear notice of its exposure in that State to suits arising from local accidents involving its cars." *Id*. (quotation marks and brackets omitted).

Of import here, the *Ford* Court noted the ubiquitous nature of Ford's advertising and market presence: "No matter where you live, you've seen them: 'Have you driven a Ford lately?' or 'Built Ford Tough.'" *Id*. at 355. The Court summarized the basis for personal jurisdiction as: "a resident-plaintiff sues a **global** car company, extensively serving the state market in a vehicle, for an in-state accident." *Id*. at 366 (parenthetical) (emphasis added).

The differential-excess rule is contrary to the *Ford* Court's clear notice-of-exposure rationale. The notion that being everywhere means that websites are nowhere (other than their principal place of business and state of incorporation) is

contrary to *Ford*'s description of Ford's ubiquitous presence. Such a rule also conflicts with the bedrock jurisdictional question of whether it is "reasonable and just according to our traditional conception of fair play and substantial justice to permit the state to enforce the obligations" against a website doing substantial business within the State. *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 320 (1945).

## B. Internet Transactions Are Not Accorded Special Exemptions in Supreme Court Jurisprudence.

In 2018, the Supreme Court addressed the issue of "virtual connections to the State" in *Wayfair,* 585 U.S. at 181. Recognizing a state's authority to tax companies that maintain an internet platform without any brick-and-mortar "physical presence" in the state, the *Wayfair* decision overruled the dormant Commerce Clause decisions *Nat'l Bellas Hess, Inc. v. Dep't of Revenue of Ill.*, 386 U.S. 753 (1967), and *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992). *Wayfair* collects criticisms of the "physical presence" requirement, including the critique that "the Court 'should focus on rules that are appropriate to the twenty-first century, not the nineteenth.'" 585 U.S. at 176 (quoting Walter Hellerstein, <u>Deconstructing the Debate Over State Taxation of Electronic Commerce</u>, 13 Harv. J.L. & Tech. 549, 553 (2000)). "Each year, the physical presence rule becomes further removed from economic reality[.]"

*Id*. "Modern e-commerce does not align analytically" with the "artificial, anachronistic" physical presence rule. *Id*. at 180, 188.

In abolishing the physical presence requirement for state taxes, *Wayfair* explains that "the physical presence rule is not a necessary interpretation of the requirement that a state tax must be applied to an activity with a substantial nexus with the taxing State." *Id*. at 176 (citation and quotation marks omitted). Significant here, the Supreme Court explained that the "nexus requirement" in the dormant Commerce Clause context is closely related to the due process requirement of "minimum connection" in the jurisdiction context, noting: "It is settled law that a business need not have a physical presence in a State to satisfy the demands of due process." *Id*. at 177 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted with no need for physical presence within a State in which business is conducted," and "the requirements of due process are met irrespective of a corporation's lack of physical presence in the taxing State." *Id*. (ellipses, brackets, and citation omitted). *Wayfair* finds that "economic and virtual contacts" with the State satisfied the nexus requirement that the business must have "avail[ed] itself of the substantial privilege of carrying on business in that jurisdiction." *Id*. at 188 (citation and quotation marks omitted).

Comparing a hypothetical company with a "pervasive Internet presence" to one with an in-State brick-and-mortar warehouse, the Court explained that the physical presence distinction "simply makes no sense." *Id*. at 180. *Wayfair* also explains how operating an internet platform accessible in a State could constitute a "physical presence" in the State once the platform is used there: "a company with a website accessible in South Dakota may be said to have a physical presence in the State via the customers' computers. A website may leave cookies saved to the customers' hard drives, or customers may download the company's app onto their phones." *Id*. at 181. The Court credited "the Cyber Age" and "[t]he Internet's prevalence and power" as a basis for breaking with stare decisis and overruling *Quill*. *Id*. at 184.

In sum, websites should not be accorded the special protection of a differential-excess requirement on the theory that internet use is categorically different from shipping a physical good. As quoted above, the Supreme Court analyzed this purported distinction in the Commerce Clause context, and rejected the theory that a physical presence is necessary to make a forum connection.

## III. The Differential-Excess Rule Could Deprive States of Any Appropriate Venue to Enforce Their Own State Law Regarding Internet Companies Doing Business Within Their Borders.

If the differential-excess rule is broadly adopted, an internet-based company which conducts business ubiquitously across the fifty states but does not specifically

target or single out any one state, might claim to be subject to personal jurisdiction only in its home state. For a private plaintiff bringing a lawsuit against a foreign defendant based on her own state's consumer protection or internet privacy statutes, this result might mean that the plaintiff would be required to voluntarily submit to the personal jurisdiction of the defendant's home state, *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880, (2011), or the corresponding federal district court via diversity subject matter jurisdiction. 28 U.S.C. § 1332. As described above, this outcome is supported neither by principles of due process, nor by Supreme Court precedent.

Although this doctrine might prove unnecessarily burdensome to a private plaintiff, such a case does not implicate issues of sovereignty or comity among the states. However, if a sovereign state through its attorney general were to bring a case attempting to enforce the state's own consumer protection or privacy laws (for example, suing a foreign internet company for unlawfully harvesting user data from the state's residents in violation of the state's laws, *see, e.g.*, Nev. Rev. Stat. Ann. §§ 603A.010, *et seq.*), a lack of personal jurisdiction over the defendant in the state's courts would prove far more problematic. For a sovereign state suing a foreign defendant for violating state law, a lack of personal jurisdiction in the state's own courts leaves no appropriate venue to enforce the state's substantive laws.

One potential forum for the state attorney general would be to file the lawsuit, based on her state's statutory law, in the *defendant's* home state court. This outcome undermines the sovereignty and comity of both the plaintiff state and the forum state. The plaintiff state would find itself forced to submit to and rely on the jurisdiction of a co-equal sister state to enforce its own state law, while the forum state would find itself forced to employ its jurisdiction to adjudicate and enforce the substantive law of *its* co-equal sister state. Placing a state in direct judgment over another sovereign state creates tension with the bedrock principles of sovereignty and comity among the states that are foundational to the Constitution. *Escanaba Co. v. City of Chicago*, 107 U.S. 678, 689 (1883) ("Equality of constitutional right and power is the condition of all the states of the Union, old and new.").

The only potential remaining path for a state attorney general to bring a lawsuit against a foreign internet-based defendant would be to bring the suit in the defendant's home federal district court by finding a viable federal cause of action over which federal courts have exclusive jurisdiction to assert in parallel to the state law claims. As a practical matter, this might be possible in some cases—there are many areas of similarity between federal consumer protection laws and various state statutes. *See, e.g.* Nev. Rev. Stat. Ann. § 598.840(5) (citing to Federal Trade Commission definition of "franchise"); Miss. Code Ann. § 75-24-3(c) (courts are to be guided by Federal Trade Commission interpretations). However, regardless of the

potential availability of federal claims to a state attorney general, requiring a state to rely on federal law to bring a claim against a foreign internet-based defendant would undermine the plenary power of the state to define its own law, independent of the federal government. U.S. Const. amend. X; *see also Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 21 n.22 (1983) (noting considerations of comity and recognizing that a State has the right to bring cases in the courts of that State unless a clear rule demands otherwise).

These outcomes arise because the differential-excess rule creates a gross mismatch between (i) the reach of a state's substantive consumer laws governing internet-based companies that operate in the state and do business with its citizens and (ii) the personal jurisdiction analysis requiring unique targeting of the state in order to hale the company into court. The effect of the differential-excess rule is not merely to isolate jurisdiction in a defendant's home state—"We exist uniformly everywhere, and so can be sued nowhere"—but to effectively immunize interactive internet services from substantive state law by potentially depriving states of any appropriate forum for enforcement.

\* \* \*

# CONCLUSION

The Amici States request that the Court reverse the district court decision and hold that a defendant's aiming of its internet-related conduct at a jurisdiction need not exceed its aiming at other jurisdictions to constitute "express aiming" at that jurisdiction.

Respectfully submitted this 2nd day of July 2024.

LYNN FITCH
Attorney General of Mississippi


CRYSTAL UTLEY SECOY
Director, Assistant Attorney General
Consumer Protection Division
Office of Mississippi Attorney General
Post Office Box 220
Jackson, MS 39205
crystal.utley@ago.ms.gov

KRIS MAYES
*Attorney General*
*State of Arizona*
2005 N Central Avenue
Phoenix, AZ 85004

ROB BONTA
*Attorney General*
*State of California*
455 Golden Gate Ave
11th Floor
San Francisco, CA 94102

AARON D. FORD
Attorney General of Nevada

By: /s/ Jeffrey M. Conner
HEIDI PARRY STERN (Bar. No. 8873)
Solicitor General
JEFFREY M. CONNER (Bar No. 11543)
Chief Deputy Solicitor General
Office of the Nevada Attorney
General
100 N. Carson St.
Carson City, NV 89701
jmconner@ag.nv.gov

TIM GRIFFIN
*Attorney General*
*State of Arkansas*
323 Center Street, Suite 200
Little Rock, Arkansas 72201

PHILIP J. WEISER
*Attorney General,*
*State of Colorado*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106


BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

RAÚL R. LABRADOR
  *Attorney General*
  *State of Idaho*
700 W. Jefferson Street
P.O. Box 83720
Boise, ID 83720-0010

THEODORE E. ROKITA
  *Attorney General*
  *State of Indiana*
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, Maine 04333

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
Carvel State Building
820 N. French St.
Wilmington, DE 19801


ANNE E. LOPEZ
  *Attorney General*
  *State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

BRENNA BIRD
  *Attorney General*
  *State of Iowa*
Hoover State Office Building
1305 E. Walnut Street
Des Moines, IA 50319

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA  02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

JOHN FORMELLA
*Attorney General*
*State of New Hampshire*
1 Granite Place South
Concord, NH 03301

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Villagra Building
Santa Fe, NM 87501

JOSHUA H. STEIN
*Attorney General*
*State of North Carolina*
114 W. Edenton St.
Raleigh, NC 27603

GENTNER DRUMMOND
*Attorney General*
*State of Oklahoma*
313 NE 21st Street
Oklahoma City, OK 73105

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
The Capitol
Albany NY 12224-0341

DREW H. WRIGLEY
*Attorney General*
*State of North Dakota*
600 E. Boulevard Ave.
Dept. 125
Bismarck, ND 58505

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

MARTY JACKLEY
  *Attorney General*
  *State of South Dakota*
1302 E. Hwy 14
Suite 1
Pierre, SD 57501-8501

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100

ALAN WILSON
  *Attorney General*
  *State of South Carolina*
P.O. Box 11549
Columbia, SC 29211

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State St.
Montpelier, VT 05609

**CERTIFICATE OF COMPLIANCE**

I certify that the attached amicus brief is proportionately spaced, has a typeface of 14 points or more, and contains 4,352 words in compliance with Cir. R. 29-2(c)(3).

RESPECTFULLY SUBMITTED this 2nd day of July, 2024.

AARON D. FORD
Attorney General

By:/s/ Jeffrey M. Conner
    JEFFREY M. CONNER (Bar No. 11543)
    Chief Deputy Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2024, the foregoing document was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing system thereby effecting service upon all registered case participants.

_s/ Amanda White_____
AG Supervising Legal Secretary