---

Docket No. 22-15815

---

BRANDON BRISKIN,
on behalf of himself and those similarly situated,
Plaintiff-Appellant,

v.

SHOPIFY INC., *et al.*,
Defendants-Appellees.

Panel Opinion Filed: November 28, 2023

---

APPEAL FROM ORDERS OF THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
HON. PHYLLIS J. HAMILTON, PRESIDING
CASE NO. 4:21-CV-06269-PJH

---

**BRIEF OF AMICUS CURIAE PAUL SCHIFF BERMAN IN
SUPPORT OF PLAINTIFF-APPELLANT**

---

CAPSTONE LAW APC
*RYAN H. WU (SBN 222323)
RYAN.WU@CAPSTONELAWYERS.COM
TYLER.ANDERSON@CAPSTONELAWYERS.COM
1875 CENTURY PARK EAST, STE.1000
LOS ANGELES, CALIFORNIA 90067
TEL: (310) 556-4811; FACSIMILE: (310) 943-0396

*Attorneys for Amicus Curiae*
*Professor Paul Schiff Berman*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

PROPOSED AMICUS BRIEF ...................................................................... 1

STATEMENT OF *AMICUS CURIAE* ........................................................ 1

INTRODUCTION ........................................................................................ 2

ARGUMENT ............................................................................................... 2

I.    The Panel Improperly Treated Shopify's Many Efforts to Expand Its Business in California and to Work with California Merchants as "Unrelated" to the Claims in this Lawsuit and Therefore Wrongly Concluded that those Efforts Were Irrelevant to the Personal Jurisdiction Inquiry. ........................................... 2

II.   The Panel Misconstrued the U.S. Supreme Court's Decision in *Walden v. Fiore*, Ignoring Obvious Ways in Which Shopify's Purposeful Contacts with California Far Exceed the Defendants' Forum Contacts in *Walden*. ................................................ 12

III.  The Panel Articulated a New Rule for Assessing Personal Jurisdiction over Internet-Based Contacts that Is both Unworkable in a World of Ubiquitous Online Commercial Activity and Ignores the Important Interest of California in Protecting Its Citizens and Applying Privacy Standards Against Large Corporations that Deliberately Profit from Continuous and Systematic Business with Merchants and End-Users in the State. .......................................... 15

      A.    Community Affiliation Is a More Plausible Basis for Analyzing Jurisdiction than Merely Counting Contacts with a Territorially Based Sovereign. ............................................................ 18

      B.    The Relevant Inquiry for Personal Jurisdiction Is the Degree to which a Community Can Legitimately Exercise Dominion Over a Lawsuit, Rather than

Whether the Exercise of Jurisdiction Is an
Unfair Burden on the Defendant............................................. 27

C. The Territorial Location of Data Is
Irrelevant...................................................................................... 31

D. The Size, Sophistication, and Economic
Breadth of an Actor Is Relevant to the
Jurisdictional Inquiry................................................................. 33

E. Using the Above Jurisdictional Criteria,
California May Assert Jurisdiction over
Shopify Regarding the Acts Alleged in the
Complaint. .................................................................................... 35

CONCLUSION................................................................................... 38

ATTESTATION REGARDING SIGNATURES ......................................... 39

CERTIFICATE OF COMPLIANCE ........................................................ 40

CERTIFICATE OF SERVICE ................................................................ 41

# TABLE OF AUTHORITIES

**CASES**

*Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255 (2017). ........... 9, 21

*Calder v. Jones*, 465 U.S. 783 (1984) .......................................... 13

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ........................................... 21

*Davis v. Farmers Coop. Equity Co.*, 262 U.S. 312 (1923) ......................... 30

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351(2021) ......................................................................passim

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011) ........................................................................ 20, 21

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) .............................................................................. 6

*Inset Systems, Inc. v. Instruction Set, Inc.*, 937 F. Supp 161 (D. Conn. 1996).................................................................... 22

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310 (1945) ........................................passim

*J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011) ............. 19, 20, 34

*Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023)................. 22, 27, 28, 31

*McGee v. International Life Insurance Co.*, 335 U.S. 220 (1957)............ 4, 6

*Pennoyer v. Neff*, 95 U.S. 714 (1878)...................................... 4, 23

*Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002) ........... 24, 26

**CONSTITUTIONAL PROVISIONS**

Fed. R. App. P. 29........................................................... 1

**SECONDARY SOURCES**

PATRICIA L. BELLIA, *ET AL.*, CYBERLAW: PROBLEMS OF POLICY AND JURISPRUDENCE IN THE INFORMATION AGE (5th ed. 2018)........................ 1

Paul Schiff Berman, *The Future of Jurisdiction*, 102 Wash. U. L. REV. (forthcoming 2025) (available at The Future of

Jurisdiction by Paul Schiff Berman : SSRN) (last accessed
June 26, 2024) ................................................................ 1, 2, 3, 33

## PROPOSED AMICUS BRIEF

## STATEMENT OF *AMICUS CURIAE*

Amicus Curiae Paul Schiff Berman, Walter S. Cox Professor of Law at The George Washington University Law School, has published influential articles on the digital scope of personal jurisdiction.[1] He was among the first legal scholars to focus on issues regarding online activity, and he is co-author of one of the leading casebooks in the field.[2] He offers his perspective on the errors of the panel decision and proposes an alternative functionalist approach grounded in Supreme Court precedent.

Prior to filing, the moving attorneys obtained consent from the parties to file this brief. *See* Fed. R. App. P. 29(a).[3]

---

[1] *See, e.g.*, Paul Schiff Berman, *The Future of Jurisdiction*, 102 WASH. U. L. REV. (explaining the current state of the law) (forthcoming 2025) (available at The Future of Jurisdiction by Paul Schiff Berman: SSRN) (last accessed June 26, 2024).

[2] PATRICIA L. BELLIA, *ET AL.*, CYBERLAW: PROBLEMS OF POLICY AND JURISPRUDENCE IN THE INFORMATION AGE (5th ed. 2018).

[3] The undersigned certify that no party's counsel authored this brief, and no person contributed money to it. Undersigned attorneys are familiar with the issues presented and have reviewed the relevant material. The brief submitted does not repeat the petitions filed by any party.

**INTRODUCTION**

Although the U.S. Supreme Court has repeatedly struggled with the question of how to apply its personal jurisdiction framework to internet-based contacts,[4] this Court must apply the Supreme Court's precedents in a way that reflects the social and economic realities of online interaction and commercial activity. Unfortunately, the panel decision under review does the opposite, ignoring existing precedent while creating a "novel," unworkable jurisdictional test that moves in the wrong direction. This Court should reverse the panel decision and articulate a more coherent framework for jurisdictional analysis.

**ARGUMENT**

**I.  The Panel Improperly Treated Shopify's Many Efforts to Expand Its Business in California and to Work with California Merchants as "Unrelated" to the Claims in this Lawsuit and Therefore Wrongly Concluded that those Efforts Were Irrelevant to the Personal Jurisdiction Inquiry.**

The panel's first mistake was its refusal to consider Shopify's

---

[4] *See* Paul Schiff Berman, *The Future of Jurisdiction*, 102 Washington University Law __, 3–17 (explaining the current state of the law) (forthcoming 2025) (available at [The Future of Jurisdiction by Paul Schiff Berman : SSRN](#)).

many contacts with California aimed at increasing its customer base there. (Dkt. 47, 11–14.) According to the panel, those contacts are insufficiently related to plaintiffs' lawsuit. *Id.* at 13. But this conclusion is wrong for two reasons. First, the U.S. Supreme Court has never said that unrelated contacts should be excluded altogether from the specific jurisdiction inquiry, and adopting the panel's approach would run completely counter to the whole purpose of the *International Shoe* minimum contacts test. *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945). Second, even on its own terms, the analysis is wrong because the contacts the panel refused to consider are in fact quite related to the suit, and the panel only reached a contrary conclusion by imposing a "but-for" causation test for relatedness that the Supreme Court expressly rejected in *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 361 (2021).

To begin, the panel decision wrongly assumes that any contacts a defendant has with a forum state that are unrelated to the cause of action are automatically irrelevant to the jurisdictional inquiry and cannot be considered. (Dkt. 47, at 11–14.) But no U.S.

Supreme Court case supports such an approach. To the contrary, the entire thrust of the Supreme Court's personal jurisdiction jurisprudence points in the opposite direction. The purpose of the *International Shoe* minimum contacts test was to abandon the formalistic territorial line drawing of *Pennoyer v. Neff*, 95 U.S. 714 (1878). *Int'l Shoe*, 326 U.S. at 316–20. That strict territorialist approach had allowed increasingly large national corporations to impose harms on a jurisdiction without literally having a territorial presence there. *Id.* Thus, *International Shoe* replaced *Pennoyer*'s emphasis on territorial presence with a more holistic inquiry of a defendant's many and varied contacts with a jurisdiction to determine whether those contacts, taken as a whole, were sufficient to justify the state's assertion of jurisdiction. *Id.*

*International Shoe* left unresolved how to analyze jurisdiction in more difficult cases, when either (1) the number of contacts were fewer, or (2) the lawsuit was more tangential to those contacts.

*McGee v. International Life Insurance Co.*, 335 U.S. 220 (1957), addressed the first of these questions. The Supreme Court determined that just one contact between the defendant and

California was sufficient for California to assert jurisdiction because "the suit was based on a contract which had substantial connection with [the forum]." *Id.* at 223.

Meanwhile, as to the second question, it is significant that the Court in *International Shoe* had left the door open for a contextual approach to jurisdiction, noting that "there have been instances in which … continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe*, 326 U.S. at 318. The Court reiterated this idea in dicta in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980), noting that "if the sale of a product of a manufacturer or distributor … is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in [several or all] other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others."

Thus, by the 1980s a rough continuum had emerged. The

fewer contacts a defendant had with a state the more important it was that those contacts be directly related to the lawsuit (with *McGee* as the extreme case of just a single, highly related contact). On the opposite end of the spectrum, the more contacts a defendant had with a state the less important it was that those contacts be directly related to the suit. Subsequently, the Court named these two different types of jurisdictional assertion "specific" and "general." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

But simply naming the two types of jurisdiction did not change the basic calculus. The relevant question in specific jurisdiction cases—where the cause of action is related to contacts in the state—is whether the defendant's contacts with the state, taken as a whole, are sufficient to justify the exercise of jurisdiction. Never has the Supreme Court suggested that in a specific jurisdiction case the reviewing court should exclude from consideration any contacts a defendant might have with a state that are unrelated to the suit.

To the contrary, the recent *Ford Motor* case explicitly ratified the dicta in *World-Wide Volkswagen* and reiterated that the many

cars a manufacturer sells, services, and advertises in a state can support a finding of specific jurisdiction, even if the particular car at issue was not one of those cars that were sold, serviced, or advertised in the state. *Ford Motor*, 592 U.S. at 364. Of course, there must be some tie between the plaintiff's claim and the contacts; otherwise the case would be analyzed under the rubric of general jurisdiction. But assuming there is such a tie, then all of the defendants' contacts with a state, related or not, become part of the jurisdictional calculus, as *Ford Motor* makes clear. *Id.*

Indeed, ignoring a defendant's unrelated contacts with a state would be contrary to the entire purpose of the *International Shoe* inquiry. The minimum contacts test is meant to examine whether a defendant has sufficiently affiliated itself with a community or purposefully availed itself of the privilege of doing business there such that the community may fairly assert jurisdiction over the company. Thus, as *Ford Motor* held, Ford's numerous cars, dealerships, billboards, and so on in the forum state are absolutely relevant to the jurisdiction determination, even if the precise car that crashed was sold outside the state. *Ford Motor*, 592 U.S. at 363.

The same is true of Shopify. The company has clearly adopted a business model with strong connections to California. It entered into deals with California corporations such as Stripe in order to process financial transactions. (Excerpts of Record, Vol. 1, p. 98–100, 104.)[5] It actively recruited California businesses to use Shopify as its customer support engine. (ER 95–98.) And because Shopify's financial model relies on taking a percentage of each sale, the active recruitment of California merchants constitutes a deliberate decision to conduct business in California with California merchants, and therefore collect money from the California customers of those merchants. (ER 95–100, 104.) Finally, Shopify's business model involves collecting and monetizing the personal data of its end-users, the more the better. *Id*. This again involves the deliberate exploitation of the California market.

Such a business model and its "continuous and systematic" contacts with California should make the jurisdictional inquiry easy. *See Int'l Shoe*, 326 U.S. at 317. Of course, such contacts would not be

---

[5] Hereinafter in "ER-[Page No.]" format. This case contains only a single volume Excerpt of Record.

sufficient if the customer suing were a resident of another state who had never transacted business in California. As the Supreme Court established in *Bristol-Myers Squibb*, that would be an assertion of general jurisdiction, and the plaintiff would not be able to sue in California unless the defendant were a citizen there. *See [Bristol-Myers Squibb Co. v. Superior Ct., 582 U.S. 255, 262 (2017)](#)*.

But so long as the plaintiff is a California consumer asserting jurisdiction based on a transaction that occurred with a California merchant in California using Shopify's platform, there can be no plausible claim that California's assertion of jurisdiction is somehow attenuated, accidental, unforeseen, or unrelated to Shopify's concerted efforts to access and profit from the California market. For the panel to ignore this fundamental economic reality through formalistic tests that slice and dice the contacts and exclude many of them from consideration ignores the whole purpose of the minimum contacts inquiry. (Dkt. 47, 11–14.)

Even if one were to accept the panel's dubious methodology that requires eliminating from consideration all contacts a defendant might have with the state that are deemed unrelated to

the underlying lawsuit, the panel misapplied its own methodology. The contacts rejected by the panel are quite obviously related to the underlying suit. Again, one need only look at *Ford Motor* to see why. Based on Ford's advertisements, sales, and servicing of the car model in the state, the Court had no difficulty concluding that "Ford had systematically served a market in [the forum] … So there is a strong 'relationship among the defendant, the forum, and the litigation'—the 'essential foundation' of specific jurisdiction." *Ford Motor*, 592 U.S. at 353. In making this determination, the Court rejected the "but for" causation test for relatedness that the panel adopted in this case. *Ford Motor*, 592 U.S. at 373 (Alito, J. concurring) ("The Court properly rejects that argument").

Indeed, Ford had argued that its sales, advertisements, and service centers in the forum states could not be counted as related contacts precisely because none of those could be shown as being the "but for" cause of the plaintiffs' purchase of the cars that crashed. *Ford Motor*, 592 U.S. at 361. But Ford lost, and the Court did not require any proof that all those contacts were the reason for the plaintiffs' transactions. *Id.* ("Ford's causation-only approach finds no

support").

Once the "but for" causation test is cleared out of the way, it becomes obvious that Shopify's contacts with California form one integrated whole. Its business model required it to affiliate with a California corporation for payment processing, to enroll as many California merchants as possible to use its service, and to extract revenue and data from the customers of those merchants. (ER 95–100, 104.) It established a facility in California to market its services to California merchants. (ER 95–96.) And it created a fulfillment center in California to service those California customers efficiently. (ER 95–96.) Thus, it cannot reasonably be said that the transaction at issue is unrelated to all of Shopify's various efforts to affiliate with California and access its market, just as it was clear that all of Ford's activities in the forum states were sufficiently related to the suit to justify jurisdiction regardless of whether or not those activities literally caused the customer to purchase the relevant product.

## II. The Panel Misconstrued the U.S. Supreme Court's Decision in *Walden v. Fiore*, Ignoring Obvious Ways in Which Shopify's Purposeful Contacts with California Far Exceed the Defendants' Forum Contacts in *Walden*.

The panel also wrongly relied on the U.S. Supreme Court's decision in *Walden v. Fiore*, 571 U.S. 277 (2014). *Walden*'s facts are easily distinguishable from this case, and indeed the logic of *Walden*, properly applied, supports the assertion of jurisdiction here.

In *Walden*, federal agents working at an airport in Georgia detained and seized property from travelers who had landed there. *Id.* at 280. Subsequently, the travelers, citizens of Nevada, tried to sue the officers in Nevada on the ground that although they were detained in Georgia the harm that they suffered was felt in Nevada. *Id.* at 281. Further, plaintiffs argued that the officers' knowledge that the travelers were from Nevada was sufficient to constitute minimum contacts with Nevada. *Id.* at 290–91.

The Supreme Court rightly rejected this far-fetched claim. *Id.* The Court recognized that the defendants in *Walden* acted solely in Georgia and had done nothing to voluntarily affiliate themselves with Nevada. *Id.* Thus, the mere fact that the travelers were from Nevada—even if that fact was known to the defendants—was not

enough to justify jurisdiction given that the defendants themselves had done nothing to purposely affiliate themselves with Nevada. *Id.*

*Walden* stands in contrast to [*Calder v. Jones*, 465 U.S. 783 (1984)](). In *Calder*, the Court found that there was jurisdiction over a writer based in Florida who chose to write an article about a California actress. *Id.* at 791. The Court emphasized that the writer chose to pursue the article knowing the actress was in California, that in the development of the story the writer interviewed various people from California, and that the writer knew the article would impact the defendant's reputation there. *Id.* at 788–89.

Shopify's contacts with California are far more extensive and far more volitional than the defendants' contacts in *Walden*. Indeed, they are more extensive than even the defendants' contacts in *Calder*. Shopify chose to expand its business into California; it chose to use the technology of a California company and contracted with that company. (ER 95–100, 104.) It then worked to solicit merchants in California to encourage them to use Shopify's technology platform. (ER 95–96.) And it even opened a fulfillment center in California to respond to these orders. *Id*. These are far more

intentional and sustained contacts with California than the defendant had with the forum state in *Walden*.

The panel treats this case as if it is only happenstance that the plaintiff consumers are from California. (Dkt. 47, 11–14.) The panel opinion conceptualizes Shopify as if it were simply a passive website that consumers visit with no volitional act on Shopify's part at all. *Id*. But that is not what the complaint alleges. Instead, according to the complaint, Shopify deliberately targeted the California market in multiple ways, earning revenue and collecting data from California consumers and California merchants as part of Shopify's core business model. (ER 95–100, 104.) Thus, *Walden* is easily distinguishable and in no way supports denial of jurisdiction.

To the contrary, the logic of *Walden* suggests precisely the opposite, that jurisdiction may be exercised here. As discussed above, the court lacked jurisdiction over the defendants in *Walden* because the defendants did nothing to intentionally affiliate with Nevada or reach out to people in Nevada. *Walden*, at 289–90. They were simply working in Georgia when people from Nevada happened to pass through the airport. *Id*. But Shopify, in contrast,

did reach out to California in multiple ways and established a

business model that was designed to serve thousands of customers

and merchants there. (ER 99–100, 104.) These are precisely the sort

of facts that would have made *Walden* come out the other way.

### III. The Panel Articulated a New Rule for Assessing Personal Jurisdiction over Internet-Based Contacts that Is both Unworkable in a World of Ubiquitous Online Commercial Activity and Ignores the Important Interest of California in Protecting Its Citizens and Applying Privacy Standards Against Large Corporations that Deliberately Profit from Continuous and Systematic Business with Merchants and End-Users in the State.

Finally, the panel's proposed framework for analyzing

internet-based jurisdictional contacts is unworkable. Although it

was understandably trying to protect against a regime of universal

jurisdiction over websites anywhere they are accessed, the panel

bends too far in the other direction. Of course, jurisdiction can be

asserted only if the defendant in some way deliberately targets a

state and accesses a market there or knowingly causes harm. But

the panel opinion adopts a test that not only requires deliberate

targeting of a specific state, but also something more that would

indicate that the defendant is targeting a state over and above other

jurisdictions. As the panel opinion puts it, "what is needed is some prioritization of the forum state, some differentiation of the forum state from other locations, or some focused dedication to the forum state[.]" (Dkt. 47 at 25.)

This jurisdictional test is far too restrictive and far too easy for large companies to abuse. For example, consider some of the largest online platforms in the world: Google, Meta, X (formerly Twitter), and so on. These companies do not need a physical facility in any particular jurisdiction in order to conduct millions of dollars' worth of business there, while scooping up lucrative data that is then monetized. And they can easily treat every state the same, without doing anything that targets any one state over and above the others. In such a circumstance, it cannot be that these companies can only be sued in their home states (or, if headquartered abroad, like Shopify, no state at all).

Accordingly, this Court should reject the panel's test and apply the Supreme Court's personal jurisdiction precedents in a way that responds to the social and commercial realities of the 21st century. In so doing, the following principles should guide the Court:

- Application of the *International Shoe* minimum contacts test should not be based merely on physical contacts with a territory, but on affiliation with a community. This is especially important in a world where physical location is sometimes difficult (or impossible) to pinpoint and sometimes largely irrelevant to the reality of the underlying transaction being analyzed.

- The relevant inquiry for personal jurisdiction is the degree to which a community can legitimately exercise dominion over a lawsuit, rather than whether the exercise of jurisdiction is unduly burdensome to the defendant.

- Trying to serve a market is a more relevant jurisdictional hook than targeting a territory. Thus, a company seeking to sell or distribute a product nationwide should be deemed to have affiliated with any community where that product is sold and causes harm, regardless of whether or not the company has targeted a particular state over and above others.

- The location of online servers or data may sometimes be

relevant to the jurisdictional calculus, but should not be determinative, given that such factors often are arbitrary, manipulable, and divorced from the substantive connections that should be the focus of the jurisdictional inquiry.

o The size, sophistication, and economic breadth of an actor is relevant to the jurisdictional inquiry.

### A. Community Affiliation Is a More Plausible Basis for Analyzing Jurisdiction than Merely Counting Contacts with a Territorially Based Sovereign.

We are living through a period of large-scale societal transition, and if the *International Shoe* minimum contacts test is applied too woodenly it will become an unsatisfying approach in a 21st century dominated by virtual social life, deterritorialized goods and effects, and the ability of large companies to reach consumers anywhere anytime. In such a world, physical "contacts" with a territorially based entity does not fully capture the reality of the underlying transaction. Indeed, although the U.S. Supreme Court has not directly addressed a jurisdiction case involving only internet-based interaction, the Court's oral arguments[6] and even

---

[6] *See e.g.*, Transcript of Oral Argument at 39, *Ford Motor*, 592

opinions[7] in this area frequently invoke hypotheticals regarding online activity, with the justices recognizing that the internet poses distinctly difficult problems that hover in the background of every jurisdiction case the Court faces.

But even as the Supreme Court evades its responsibility to establish jurisdictional rules regarding online interaction, this Court must apply *International Shoe* in a way that responds to the realities of 21st century social life and the ways commercial activity actually operates. Such an approach requires jettisoning a single-minded focus on physical contacts with a territorially based location.

Instead, this Court should adopt a framework for analyzing jurisdiction cases based on substantive community affiliation. The real question underlying jurisdiction is whether a legal dispute sufficiently implicates a community such that it is appropriate for that community to assert dominion over the dispute without unduly encroaching on the sovereignty of other states. And while the

---

U.S. 351 (No. 19-368).

[7] *See, e.g.,* *J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 892 (2011)* (Breyer, J., concurring); *Ford Motor, 592 U.S. at 366 n.4.*

answer to that question is not always beyond dispute, it at least focuses attention on the core issues that should determine a jurisdictional inquiry.

The community affiliation approach has begun to creep into the Supreme Court's jurisdiction jurisprudence. Prior to 2011, the language of community affiliation was rarely used. But in *Goodyear*, the Court for the first time defined both general and specific jurisdiction in terms of affiliation. According to the Court, general jurisdiction over defendants requires that they have "affiliations with the State" that are "so continuous and systematic as to render them essentially at home in the forum State," whereas "specific jurisdiction requires an "affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). That same year, in *McIntyre*, Justice Ginsburg's dissent argued that "[a]djudicatory authority is appropriately exercised where actions by the defendant … give rise to the affiliation with the forum." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 905 (2011) (Ginsburg, J., dissenting). Three years later, the Court in *Daimler* repeated the affiliation language

from *Goodyear* and emphasized that under *Goodyear*, "only a limited set of affiliations with a forum" allow the forum state to exercise general jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

In *Bristol-Myers Squibb*, the Court again emphasized affiliation, but this time focused not so much on the defendant's affiliation with the forum, but on the need for "'an affiliation between the forum and the underlying controversy.'" *Bristol-Myers Squibb*, 582 U.S. at 262 (quoting *Goodyear*, 564 U.S. at 919). And in *Ford Motor*, the Court picked up on the affiliation language in *Goodyear*, *Daimler*, and *Bristol-Myers Squibb*, quoting each of these cases and four times referring to the idea of affiliation, before concluding that "each of the plaintiffs brought suit in the most natural State—based on an 'affiliation between the forum and the underlying controversy.'" *Ford Motor*, 592 U.S. at 370.

Finally, in *Mallory*, the Court added the word "community" into the mix, justifying the assertion of jurisdiction in Pennsylvania based in part on the fact that the defendant had "proclaimed itself a proud part of the Pennsylvania Community." *Mallory v. Norfolk S.*

*Ry. Co.*, 600 U.S. 122, 143 (2023) (internal quotation omitted).

The concept of community affiliation offers a preferable rubric for analyzing jurisdiction in a world where counting contacts with a physical territory is no longer a reliable metric. Consider a website or a social media account. Such online presences are viewable in multiple jurisdictions. As such, they could potentially create harm in multiple jurisdictions. In the early days of the internet, judges viewed websites as akin to 24-hour television commercials, continuously beaming into multiple communities in multiple physical locations. *See, e.g.*, *Inset Systems, Inc. v. Instruction Set, Inc.*, 937 F. Supp 161 (D. Conn. 1996) (asserting jurisdiction over an out-of-state defendant because its website was viewable in the forum state). That approach quickly proved unworkable because it would subject anyone who operates online to potentially universal jurisdiction.

At the other extreme, one could say that jurisdiction is only appropriate in the physical location where a creator uploads content or stores data. This approach also has multiple difficulties. First, content posted in one location can create real harms elsewhere, and

it is untenable for communities to be denied jurisdiction just because the defendant created the harm elsewhere. That would return us to the *Pennoyer* world where someone could cause harm in a state but avoid local jurisdiction by remaining physically outside the borders. Second, such an approach allows a potential defendant to manipulate jurisdiction based on where that defendant chooses to upload or store data. Third, what does it mean to try to physically locate precisely where data is uploaded or stored? Data storage is often fragmented into data shards and stored through third-party sites such as Amazon Web Services. Thus, the location can be difficult to pinpoint and is in any event arbitrary and unrelated to the substance of the underlying transaction.

Instead of focusing on the physical place where content is uploaded or data is stored, one could construct an approach focused on the location of the users or viewers of a website. That approach, however, starts moving back towards universal jurisdiction, particularly if the viewers/followers/users are in multiple physical locations. It also means that a potential plaintiff can manufacture jurisdiction by encouraging just one (or a handful) of people in a

state to view or use a website or internet-based service.

To some degree, all of these questions turn on what is at its core a nonsensical metaphysical conundrum. Can we really effectively conceptualize online interaction either as if the content "enters" the homes of the users, or as if users "travel to" the website? The problem is that neither of these formulations captures the nature of the interaction, and yet because of our historic need to tie legal jurisdiction to physical territory, these sorts of spatial metaphors are the only ones we have.

In contrast, a community affiliation analysis asks a more fundamental question: does the community asserting jurisdiction have sufficient connection to the parties or the dispute so as to justify that assertion? This analytical framework focuses on the question that should be at the heart of jurisdictional analysis.

Consider, for example, *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002). Two Connecticut newspapers featured stories about Connecticut prisoners who had been transferred to a prison in Virginia and then had been subjected to poor treatment there. *Id.* at 259. The Virginia prison warden sued for defamation in

Virginia. *Id*. Should the newspapers be subject to jurisdiction there? From a pure territorialist point-of-view, perhaps yes. After all, the article concerned a Virginia prison. If defamatory, the harm to the warden was largely to be felt in Virginia, and there were a handful of Virginia-based subscribers to the newspapers. *See id*. at 261–62. In addition, the website with the article was certainly accessible in Virginia and was surely accessed in the state by at least a few people.

The Fourth Circuit nevertheless appropriately ruled that the newspapers could not be sued in Virginia because the "content of the websites [was] decidedly local." *Id*. at 263. According to the court, "these newspapers maintain their websites to serve local readers in Connecticut, to expand the reach of their papers within their local markets, and to provide their local markets with a place for classified ads. The websites are not designed to attract or serve a Virginia audience." *Id*. And although the article was about the Virginia prison, it focused on the prison not as part of an article that was principally about Virginia prisons or even prison conditions nationally.  Instead, the newspapers were focused on the fact that

Connecticut prisoners had been transferred there. *See id.* at 263–64. Thus, the link to Connecticut was the relevant community affiliation.

In contrast, if a company does actively attempt to access a market, that should be sufficient evidence of community affiliation, regardless of whether the company has physical contacts with that state. So, for example, *The New York Times*, *Washington Post*, or *Wall Street Journal*, despite the geographic specificity of their names, are clearly attempting to be national (or international) companies serving a wide audience. Accordingly, jurisdiction over those publications regarding an article on Virginia prison conditions could justifiably be treated differently from the far more local Connecticut newspapers in the *Young* case.

Likewise, if an internet service provider, such as Yahoo or Microsoft or Google or Shopify is making a sustained effort to access a commercial market as part of its global or national business strategy, the company is purposely affiliating itself with those markets, and regulation by those communities is therefore justifiable, regardless of physical contacts. Of course, in a world of

deterritorialized data and multinational corporate activities, it can be difficult to determine when a corporation has truly affiliated with a particular jurisdiction (though not in this case). But it is nonsensical to say that a company's deliberate efforts to access a national market would allow it to avoid jurisdiction in any particular state, just because no single state was especially targeted.

**B.    The Relevant Inquiry for Personal Jurisdiction Is the Degree to which a Community Can Legitimately Exercise Dominion Over a Lawsuit, Rather than Whether the Exercise of Jurisdiction Is an Unfair Burden on the Defendant.**

The U.S. Supreme Court's personal jurisdiction doctrine has repeatedly vacillated between two different concerns: (1) protecting the due process rights of litigants not to be sued in a distant, burdensome location, and (2) addressing issues of interstate federalism and protecting the sovereignty of states. *Mallory*, 600 U.S. at 144 (plurality op.) & 147 (Jackson, J., concurring). In the nineteenth century, these two concerns often were indistinguishable from each other, as states were conceptualized as akin to separate countries. Thus, states not only had very separate sovereign interests, but travel from one to the other was also difficult, both

psychically and logistically. But over the course of the twentieth and twenty-first centuries, these two rationales have diverged, creating difficulties for modern jurisdiction jurisprudence.

In 2021, the Supreme Court explicitly acknowledged the duality at the heart of its jurisdiction decisions. Writing for the Court in *Ford Motor*, Justice Kagan forthrightly proclaimed that jurisdictional "rules derive from and reflect two sets of values— treating defendants fairly and protecting 'interstate federalism.'" *Ford Motor*, 592 U.S. at 360 (quoting *World-Wide Volkswagen, 444 U. S. at 293*). She acknowledged that, alongside the due process interests of defendants is a separate set of interests: "those of the States in relation to each other." *Id*. Thus, because "[o]ne State's 'sovereign power to try' a suit … may prevent 'sister States' from exercising their like authority, jurisdictional principles seek 'to ensure that States with 'little legitimate interest' in a suit do not encroach on States more affected by the controversy.'" *Id*.

Most recently, the Court issued its fractured opinion in *Mallory*. Here, the question was whether Pennsylvania could assert jurisdiction over an out-of-state defendant in a suit concerning

activity unrelated to Pennsylvania based solely on the fact that the defendant had consented to jurisdiction as a condition of doing business there. *Mallory*, 600 U.S. at 127–28. Reaching back to pre-*International Shoe* caselaw, five justices agreed that jurisdiction, because it is based in the due process rights of a defendant, is waivable like all other individual rights and that the defendant therefore, could be forced to consent to jurisdiction, even regarding unrelated suits. *Id*. at 144.

Four justices dissented, arguing that allowing this sort of blanket waiver of jurisdiction, even over conduct unrelated to the state, would effectively eviscerate all limits on the assertion of jurisdiction. *Id*. at 178–89 (Barrett, J., dissenting). Thus, states that would not have jurisdiction under *International Shoe* and its progeny could simply manufacture jurisdiction through a broad consent statute.

Justice Alito concurred only in part. *Id*. at 149–63 (Alito, J., concurring in part). He provided the fifth vote for the idea that the defendant's due process right was waivable, *id*. at 144, but he argued that the assertion of jurisdiction should independently be

analyzed under the dormant Commerce Clause. *Id*. at 157–63.

Citing *Davis v. Farmers Coop. Equity Co.*, 262 U.S. 312 (1923) (a case ignored by the majority), Alito suggested that Pennsylvania should not be able to assert jurisdiction over an out-of-state corporation regarding an out-of-state dispute, despite the fact that the company had, in theory, consented to Pennsylvania jurisdiction as a condition of doing business there. *Id.* at 159–61. According to Alito, for Pennsylvania to assert jurisdiction in such circumstances would be a form of extraterritorial regulation that might violate the sovereignty of other states in violation of the Commerce Clause. *See Id.*

Focusing on the supposed burden on the defendant is an increasingly anachronistic framework for understanding the nature and purpose of jurisdictional rules. The burdens of distant litigation are now far less than in a previous era, and defendants are rarely truly arguing about the burden of litigating when they raise jurisdictional defenses. Instead, the real question is whether the community asserting jurisdiction has a sufficient connection to the events underlying the lawsuit or to the litigants so as to justify

exercising dominion over the dispute.

Justice Alito's approach in *Mallory* points towards a more fruitful framework. His analysis would turn not on the burden placed on an out-of-state defendant, but on whether a community has sufficient ties to a dispute such that it is competent to impose regulatory penalties on the defendant without unduly encroaching on the sovereignty of other states and without unduly interfering with interstate commerce. Of course, a person or corporation operating solely in one state might still object to being sued in some other state with which they are unaffiliated. But that objection, at its core, is not about any burden borne by a defendant to defend a suit in the other state. Instead, the real argument is whether the distant state should be able to assert dominion or exercise regulatory authority over the defendant. And that is a question of extraterritorial regulation, federalism, and sovereignty.

### C.     The Territorial Location of Data Is Irrelevant.

In an era of cloud computing, data can be anywhere. Even a simple e-mail message can be stored in a location completely unrelated to the sender or recipient, or even the home of the

company that controls the storage. Further, the message might not even be stored in one location; its component data parts could be split among data warehouses within multiple territorial sovereignties. And not only is the location arbitrary, but it is malleable. The data can easily be shifted from place to place instantly and algorithmically, with no human being even making a conscious decision to relocate. Finally, it is the service provider, not the end user, that controls the data location. Even if an individual lives all her life in one territorial location and deposits money in her local branch of a multinational financial institution, data related to that account could move anywhere, all based on the data storage scheme of the financial institution.

The arbitrary and malleable nature of data storage wreaks havoc on jurisdictional systems that rely on territorial location. Thus, courts should ignore data location in their jurisdictional calculus and make the jurisdictional decision independent of the location of the underlying data. Likewise, servers or other computing equipment that enable transactions are often physically located in places unrelated to the underlying transaction or the

principal activities of the intermediary. Basing a jurisdictional determination on that location, therefore, potentially allows the intermediary to choose its own jurisdiction simply by making a decision to deploy the equipment in one place versus another.

### D. The Size, Sophistication, and Economic Breadth of an Actor Is Relevant to the Jurisdictional Inquiry.

Since the very first internet jurisdiction cases in the mid-1990s, courts and commentators have struggled with what seem to be two unpalatable jurisdictional options: either jurisdiction is only legitimate where the operator of the website is located, or jurisdiction is potentially appropriate wherever the website is viewable.[8] The first option allows for regulatory evasion, and the other pushes towards a form of universal jurisdiction.

But there is no necessary reason that an individual posting on a personal website or Facebook page needs to be treated the same as a major news organization posting an article on its home page. Likewise, there is no reason that an individual artisan duck decoy

---

[8] *See* Paul Schiff Berman, *The Future of Jurisdiction*, 102 WASH. U. L. REV. at 16 (forthcoming 2025) (available at The Future of Jurisdiction by Paul Schiff Berman: SSRN).

manufacturer needs to be treated the same as Ford Motor Company.[9] Indeed, as Justice Breyer recognized in his concurrence in *McIntyre*, the possible types of internet transactions are so varied that it is difficult to create one overarching rule. *See [McIntyre](), 564 [U.S. at 890]().* He posits a coffee farmer in Kenya selling artisanal coffee online in small quantities through third parties, and he contrasts that scenario with a large multinational industrialist selling thousands of units per year through a dedicated distributor. *See id.* at 892. Even if both potentially produce a product that causes harm abroad, there is no reason that both defendants need to be treated identically for jurisdictional purposes.

Community affiliation analysis provides a way out of this seeming conundrum. Whether the defendant is a large industrialist seeking to sell multiple units on a regular basis as part of a global business plan or a large e-commerce platform corporation seeking to support consumer transactions and harvest customer data on a national or international basis, both are trying to access a market and affiliate with a community in a way that is very different from

---

[9] *[Ford Motor](), 592 U.S. at 366 n.4.*

the Kenyan coffee farmer or a solo professor posting thoughts on a personal webpage or social media site. Of course, the artisanal product can cause harm and the professor's thoughts may constitute hate speech or libel or copyright infringement in some other jurisdiction. And that might cause a court to look at how intentional the acts of those defendant were. But a company such as Ford Motor or Shopify, whose entire business model is built on growing its customer base on a national scale and who engage in numerous transactions around the country every day should not be able to avoid jurisdiction in a place where it has thousands of customers just because it was targeting the nation as a whole and not any one particular state.

### E. Using the Above Jurisdictional Criteria, California May Assert Jurisdiction over Shopify Regarding the Acts Alleged in the Complaint.

Using the criteria described above, the jurisdictional analysis in this case is straight-forward. Shopify is a large, sophisticated company operating on an international scale. (ER 97.) Its business model aims to expand the number of merchants using its platform and therefore the number of end-users as well. (ER 99–100.) As part

of that model, Shopify deliberately seeks to access the large and lucrative California market and takes multiple concrete steps in California to process transactions, attract California merchants to its site, and fulfill orders. (ER 97–98.) And that market is significant. (*Id.*) Shopify then knowingly takes data from California residents and analyzes and monetizes it in various ways. (ER 105–111.) All of these actions evince a desire by a sophisticated business enterprise to exploit the California market, thereby intentionally affiliating itself with California. (*Id.*) Shopify's affiliation with California can therefore easily be distinguished from the case of a foreign website that is simply accessible in California that California residents happen to use sporadically.

In addition, California has clear justification for exercising dominion over this suit. Many California merchants and end-users are using Shopify daily, resulting in Shopify deriving substantial revenue, both continuously and systematically, from California. (ER 98.) California also has a legitimate interest in protecting the privacy rights of its citizens and therefore exercising regulatory authority. And the mere fact that Shopify's business involves

intangible services rather than tangible goods should not alter the jurisdictional calculus. As the Court pointed out in both *World-Wide Volkswagen* and *Ford Motor*, the defendant can readily anticipate the possibility of being sued in the forum, and if it wants to avoid jurisdiction, it can take steps to avoid doing business with consumers in that state.

In short, although any jurisdictional framework will necessarily require difficult line-drawing in edge cases, this is not one of them. Shopify has deliberately affiliated itself with the California market and derived large benefit from California merchants and customers. California has a legitimate regulatory interest in enforcing its privacy laws to protect its citizens. And there can be no serious claim that it is somehow an undue burden for Shopify to defend a lawsuit in California. Accordingly, the panel decision should be reversed, and this Court should articulate a more workable set of principles for analyzing jurisdiction based on internet contacts.

## CONCLUSION

For the foregoing reasons, amicus curiae respectfully urges the Court to vacate or reverse the panel opinion and adopt a more appropriate jurisdictional framework.

Dated: July 2, 2024                          Respectfully submitted,


By:  _/s/ Ryan H. Wu_____
                **Capstone Law APC**
                Ryan H. Wu
                Tyler Anderson

## ATTESTATION REGARDING SIGNATURES

Pursuant to Circuit Rule 25-5(f), I attest that all other signatories, and on whose behalf the filing is submitted, concur in the filing's content.

/s/ Ryan H. Wu
Ryan H. Wu

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32, the foregoing BRIEF OF

AMICUS CURIAE IN SUPPORT OF APPELLANTS-PLAINTIFF

complies with the type-volume limitation because the document is

proportionally spaced using Courier Schoolbook 14-point typeface

and contains 6,993 words of text.

*/s/ Ryan H. Wu*
Ryan H. Wu

**CERTIFICATE OF SERVICE**

I, Ryan H. Wu, hereby certify that on July 2, 2024, I electronically filed the foregoing BRIEF OF AMICUS CURIAE PAUL SCHIFF BERMAN IN SUPPORT OF PLAINTIFF-APPELLANT with the Clerk of the Court for the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Ryan H. Wu*
Ryan H. Wu