C.A. No. 22-15815

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

BRANDON BRISKIN,
on behalf of himself and those similarly situated,

*Plaintiff-Appellant*,

v.

SHOPIFY, INC., SHOPIFY (USA), INC.,
AND SHOPIFY PAYMENTS (USA), INC.,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Northern District of California (Oakland)
D. Ct. No. 4:21-cv-06269-PJH
The Honorable Phyllis J. Hamilton, District Judge

---

# EN BANC BRIEF OF THE CHAMBER OF COMMERCE
# OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE*
# IN SUPPORT OF DEFENDANTS-APPELLEES

---

Jennifer B. Dickey
Jonathan D. Urick
Kevin R. Palmer
U.S. CHAMBER LITIGATION
  CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

Adam G. Unikowsky
*Counsel of Record*
Jonathan J. Marshall
JENNER & BLOCK LLP
1099 New York Avenue, NW,
  Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

# DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), undersigned counsel states that *amicus curiae* The Chamber of Commerce of the United States of America has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: August 2, 2024

*/s/ Adam G. Unikowsky*
Adam G. Unikowsky

*Counsel of Record for Amicus Curiae The Chamber of Commerce of the United States of America*

# TABLE OF CONTENTS

DISCLOSURE STATEMENT.........................................................i

TABLE OF AUTHORITIES.......................................................iii

IDENTITY AND INTEREST OF *AMICUS CURIAE*..............................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................3

ARGUMENT .............................................................................7

I. A Website Operator or Web-Services Provider Is Not Subject to Personal Jurisdiction Based Solely on the Location of Users Who Interact with the Website or Software.........................7

    A. A Website Operator or Web-Services Provider Is Subject to Specific Personal Jurisdiction Only if It Took Some Action to Attract or Facilitate Access in the Forum State ...........................................................7

    B. This Court Should Clarify Its Case Law to Account for the Modern Realities of the Internet ...................................17

    C. The Panel's Analysis Was Correct .......................................24

II. The Specific-Personal-Jurisdiction Inquiry Should Turn on the Nature and Extent of a Defendant's Connection with the Forum State, Not Its Connections with Other States...................29

III. This Court Should Not Cut Back on Protections for Defendants Based on the Original Meaning of the Fourteenth Amendment.......................................................31

CONCLUSION .........................................................................35

CERTIFICATE OF COMPLIANCE .........................................36

CERTIFICATE OF SERVICE .................................................37

# TABLE OF AUTHORITIES

## CASES

*Admar International, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783
(5th Cir. 2021) .................................... 28

*AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201
(9th Cir. 2020) ........................................ 8, 23–24

*Axiom Foods, Inc. v. Acerchem International, Inc.*, 874 F.3d
1064 (9th Cir. 2017) ........................ 15

*be2 LLC v. Ivanov*, 642 F.3d 555 (7th Cir. 2011) ............................ 28

*Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124
(9th Cir. 2010) .................................... 19

*Briskin v. Shopify, Inc.*, 87 F.4th 404 (9th Cir. 2023),
*vacated on grant of reh'g en banc*, 101 F.4th 706
(9th Cir. 2024) ............................................. 3, 10, 13, 19,
21–22, 24–27

*Bristol-Myers Squibb Co. v. Superior Court of California*,
582 U.S. 255 (2017) ................................ 12–13

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).........................9

*Calder v. Jones*, 465 U.S. 783 (1984) ................................ 15

*Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414 (9th Cir. 1997).......... 18

*Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171
(E.D. Ark. 2019)................................ 28

*Fidrych v. Marriott International, Inc.*, 952 F.3d 124
(4th Cir. 2020) ................................ 28

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
592 U.S. 351 (2021) .................................... 15–17, 31–32

iii

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) ....................................................................... 12

*Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085
    (9th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024)................. 18–19

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945)............. 31

*J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011) ........... 9

*Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314
    (5th Cir. 2021) ................................................................................ 19

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ................. 8, 11

*Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122
    (2023) ........................................................................................ 32–33

*Mavrix Photo, Inc. v. Brand Technologies, Inc.*,
    647 F.3d 1218 (9th Cir. 2011) ............................................... 8, 21, 24

*National Pork Producers Council v. Ross*, 598 U.S. 356
    (2023) .............................................................................................. 33

*Pebble Beach Co. v. Caddy*, 453 F.3d 1151 (9th Cir. 2006)............... 18

*Rio Properties, Inc. v. Rio International Interlink*,
    284 F.3d 1007 (9th Cir. 2002) ........................................................ 19

*Shaffer v. Heitner*, 433 U.S. 186 (1977) ............................................... 8

*Timbs v. Indiana*, 586 U.S. 146 (2019) ............................................... 33

*Walden v. Fiore*, 571 U.S. 277 (2014)................................. 4, 8–9, 15, 26

*Washington Shoe Co. v. A-Z Sporting Goods Inc.*,
    704 F.3d 668 (9th Cir. 2012) .......................................................... 15

*Will Co. v. Lee*, 47 F.4th 917 (9th Cir. 2022) ................................. 29–30

iv

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ............................................................... 11, 16, 32

*XMission, L.C. v. Fluent LLC*, 955 F.3d 833 (10th Cir. 2020) ........... 28

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. XIV, § 1 ................................................ 33

**RULES**

Fed. R. App. P. 29(a)(4)(E) .................................................. 1

Fed. R. Civ. P. 4(k)(2) ......................................................... 29

**OTHER AUTHORITIES**

All About Cookies, https://allaboutcookies.org (last visited Aug. 2, 2024) ....................................................... 20

Brief for the Chamber of Commerce of the United States of America as *Amicus Curiae* in Support of Appellees, *Drammeh v. Uber Technologies, Inc.*, No. 22-36038 (9th Cir.), ECF No. 27 (July 7, 2023) ............................. 2

Brief of *Amicus Curiae* The Chamber of Commerce of the United States of America in Support of Appellant's Petition for Rehearing En Banc, *DZ Reserve v. Meta Platforms, Inc.*, No. 22-15916 (9th Cir.), ECF No. 97 (May 13, 2024) .................................................. 1

Brief of *Amicus Curiae* The Chamber of Commerce of the United States of America in Support of Appellees, *Doe v. Uber Technologies, Inc.*, No. 22-16562 (9th Cir.), ECF No. 28 (June 14, 2023). ........................................ 2

Brief of the Chamber of Commerce of the United States of America et al. as *Amici Curiae* in Support of Defendants-Appellees and Affirmance, *Popa v. PSP Group*, No. 24-14 (9th Cir.), ECF No. 42-1 (June 21, 2024) ....................... 1

Jackson, Robert H., *Full Faith and Credit—The Lawyer's Clause of the Constitution*, 45 Colum. L. Rev. 1 (1945) ................. 32

*LUMAscapes: A Visual Guide to the Digital World*, LUMA, https://lumapartners.com/lumascapes (last visited Aug. 2, 2024) ................................................................................. 13

Munro, Brock, *What Is a Demand Side Platform (DSP) and How It Helps Publishers*, Publift (updated June 28, 2024), https://www.publift.com/blog/what-is-a-demand-side-platform-dsp ..................................................................... 23

Sachs, Stephen E., Pennoyer *Was Right*, 95 Tex. L. Rev. 1249 (2017) .................................................................... 31

Sachs, Stephen E., *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703 (2020) ......................... 31–32

*Search IP Address*, ipaddress.my, https://www.ipaddress.my (last visited Aug. 2, 2024) ............................................... 9

**IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]**

*Amicus curiae* The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files briefs as *amicus curiae* in cases, like this one, that raise issues of concern to the nation's business community—including many in this Court. *See, e.g.*, Brief of the Chamber of Commerce of the United States of America et al. as *Amici Curiae* in Support of Defendants-Appellees and Affirmance, *Popa v. PSP Grp.*, No. 24-14 (9th Cir.), ECF No. 42-1 (June 21, 2024); Brief of *Amicus Curiae* The Chamber of Commerce of the United States of America in Support of

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* states that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and that no person other than *amicus*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

Appellant's Petition for Rehearing En Banc, *DZ Rsrv. v. Meta Platforms, Inc.*, No. 22-15916 (9th Cir.), ECF No. 97 (May 13, 2024); Brief for the Chamber of Commerce of the United States of America as *Amicus Curiae* in Support of Appellees, *Drammeh v. Uber Techs., Inc.*, No. 22-36038 (9th Cir.), ECF No. 27 (July 7, 2023); Brief of *Amicus Curiae* The Chamber of Commerce of the United States of America in Support of Appellees, *Doe v. Uber Techs., Inc.*, No. 22-16562 (9th Cir.), ECF No. 28 (June 14, 2023).

The Chamber has a strong interest in this case, which implicates the extent to which out-of-state entities are subject to personal jurisdiction in a State based solely on the online interaction between a user and the defendant's website, or between a user and software provided by the defendant to a third-party website operator. A broad rule would potentially subject entities doing business online to personal jurisdiction in nearly every State, a result at odds with both the personal jurisdiction framework that the Supreme Court has announced, and the federalism and fairness principles animating that framework. Such a rule would be particularly harmful to back-end services providers, like the defendants here, whose software is deployed by others across the world. The

Chamber is thus concerned that this Court's decision could make such providers *de facto* subject to specific personal jurisdiction in all fora.

This Court's en banc order states that the Court may reconsider its approach to specific personal jurisdiction in cases involving the internet. The Chamber submits this brief to provide some guideposts and principles that should govern the Court's resolution of this case and of other internet-related cases that follow.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The panel in this case correctly held that defendants (collectively, Shopify) are not subject to specific personal jurisdiction in California as to plaintiff Brandon Briskin's claims of data-privacy and unfair-competition violations. *Briskin v. Shopify, Inc.*, 87 F.4th 404, 409 (9th Cir. 2023) (*Briskin II*), *vacated on grant of reh'g en banc*, 101 F.4th 706 (9th Cir. 2024). Shopify is not based in California. It provides back-end web services that assist companies worldwide—including some in California—in interacting virtually with their own customers. Briskin is a California resident, and he was allegedly in California when his information was misappropriated. As the panel correctly explained, Shopify is not subject to specific personal jurisdiction based on the fact that a California user

3

purchased a product online from a merchant that used Shopify's back-end services.

This Court should announce a clear rule: an internet-based defendant, like any other defendant, is subject to specific personal jurisdiction only when it has taken some specific action, beyond baseline connections, to attract users in the forum State or to facilitate their access. That a user initiates an interaction with a globally available website or service does not, absent more, support personal jurisdiction in each and every State over the website operator or service provider. This rule follows from the Supreme Court's holding in *Walden v. Fiore*, 571 U.S. 277 (2014), that "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 285.

In addition, this Court should clarify the standards that govern personal-jurisdiction questions over website operators, web-services providers, and others operating in the virtual world. First, this Court should reaffirm that it is the *suit*-related in-state conduct, not the defendant's general business contacts in the State, that matters. Internet-based companies often have many partners throughout the country that assist with the operation of their businesses. But a partner's presence in the forum

State is generally not relevant to personal jurisdiction in the context of virtual services. This is particularly true in cases, like this one, brought by end users against back-end web-services providers who have no direct business relationships with those users at all.

In analyzing specific personal jurisdiction, courts have at times treated as relevant that a website is "interactive" rather than "passive"; that the website is or is not agnostic as to the location of a user; that a website utilizes the user's geography in programmatically optimizing advertising choices; or that a large user base in a particular State is predictable. Personal jurisdiction should not turn on these factors. The constitutional inquiry is about conduct by the defendant targeted at the forum itself, not at particular individuals who live there. And that inquiry should focus on the defendant's contacts with the forum State, standing alone—not on a comparison between forum-State contacts and contacts with other States.

The panel opinion correctly applied these governing principles. Shopify is not alleged to have taken any action targeted at California. Though it allegedly has several general California contacts, they have nothing to do with Briskin's claims and are properly ignored. The

interaction between Briskin and Shopify was instigated by Briskin and has nothing to do with where he lives. That both Briskin and the merchant from whom he made an online purchase happen to be based in California is irrelevant to Shopify's conduct and has no effect on the purported injury Briskin suffered.

Though scholars and some Justices have opined that the Fourteenth Amendment's Due Process Clause, as originally understood, does not offer protection against States' assertion of personal jurisdiction over out-of-state defendants, it is not the role of this Court to rewrite eight decades of personal-jurisdiction law. And to the extent some members of this Court are interested in nevertheless opining on the subject, any such discussion should recognize that robust personal-jurisdiction protections may well be baked into the constitutional structure or other constitutional provisions, as many of the leading critics of the current doctrine have acknowledged.

The panel correctly concluded that specific personal jurisdiction is lacking here. This Court should likewise affirm.

## ARGUMENT

**I. A Website Operator or Web-Services Provider Is Not Subject to Personal Jurisdiction Based Solely on the Location of Users Who Interact with the Website or Software.**

The panel correctly concluded that Shopify is not subject to specific personal jurisdiction in California. The focus of the specific-personal-jurisdiction inquiry must be on the *suit*-related contacts. This Court should hold that a website operator or web-services provider will be subject to personal jurisdiction only when it has taken some step, beyond the baseline actions essential to the operation of a web-based service, to facilitate or attract users in a particular forum. The mere fact that a third party's website is available in a forum State and injures a plaintiff there is insufficient. Applying that standard, California lacks personal jurisdiction over Shopify.

**A. A Website Operator or Web-Services Provider Is Subject to Specific Personal Jurisdiction Only if It Took Some Action to Attract or Facilitate Access in the Forum State.**

Cases involving internet conduct and internet-based defendants should be resolved using the same specific-personal-jurisdiction principles that govern other cases. As in any case, personal jurisdiction in cases involving internet-based defendants turns on "the relationship

among the defendant, the forum, and the litigation." *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).  What distinguishes internet cases is that the defendant's suit-related conduct often takes place outside of the forum State. Determining whether that conduct has nevertheless "create[d] a substantial connection with the forum State," *Walden v. Fiore*, 571 U.S. 277, 284 (2014), will therefore often implicate two fundamental principles.

First, the "analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285.  Accordingly, the mere fact that a plaintiff who is injured by web-based conduct resides in a particular State is irrelevant in determining whether the defendant is subject to specific personal jurisdiction in that State.  Consistent with that principle, this Court's cases have concluded that a defendant cannot be subject to specific personal jurisdiction in a State solely because the plaintiff accessed a website from there.  *See, e.g.*, *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1211 (9th Cir. 2020); *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1231 (9th Cir. 2011).

8

Nor does it matter that the defendant was aware of the State in which the plaintiff lived, and can therefore have foreseen that the injury would be felt in that State. The Supreme Court has long rejected foreseeability as the touchstone of specific personal jurisdiction, *see J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 883 (2011) (plurality opinion), and relying on foreseeability in the internet context would eviscerate all limits on personal jurisdiction. Virtually every web-services provider and website operator is aware of the geographic location of its users. Publicly available tools enable anyone to map an IP address, shared with a website by a user's browser, not just to a country and State but even (for U.S.-based IP addresses) to a particular *zip code*.[2] So while the plaintiff in this case emphasizes that the defendants were aware of the fact he lived in California, *see* Briskin Opening Br. 23, the same will be true in essentially every internet-related case.

Second, the connection between the defendant and the forum State "must arise out of contacts that the 'defendant *himself*' creates." *Walden*, 571 U.S. at 284 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462,

---

[2] *See, e.g.*, *Search IP Address*, ipaddress.my, https://www.ipaddress.my (last visited Aug. 2, 2024).

475 (1985)).  So if the purported connection in a particular case is the fact that the defendant caused injury to the plaintiff in the forum State, the question then becomes whether the defendant took some action that makes it at least partly responsible for the fact a plaintiff *in that particular State* was injured.

As this Court, its sister circuits, and district courts throughout the country have long recognized, making a website or a web service available in the forum State is not enough to permit the conclusion that the defendant "has purposefully directed its activities towards the forum state" or "purposefully availed itself of the privilege of conducting activities in the forum state." *Briskin II*, 87 F.4th at 412.  And as the panel correctly recognized, the "baseline connection[s]" that all internet-based services have in every forum throughout the world do not rise to the level of purposeful direction necessary to support specific personal jurisdiction. *Id.* at 420.  These principles follow from two distinctive aspects of the internet.  First, websites, and thus web-based services, are presumptively available worldwide, without any need for the provider to physically enter, register, or *do anything* in a particular geographic region. And second, without something more, that a website appeared on a user's

screen in a forum State is driven by the user's choice to access the page. It is not alone the type of defendant-driven conduct that may give rise to specific personal jurisdiction.

In *Keeton*, for instance, the Supreme Court held that the sale of physical magazines in New Hampshire enabled a plaintiff to sue the publisher for defamation in that State. *See* 465 U.S. at 773–75. But that is because the magazine publisher took specific action to send *physical objects* into the forum State, and absent that action, the content would not have been published in the State.[3] *See id.* at 772. The Supreme Court's reasoning in *Keeton* would not apply to a case in which a New Hampshire resident viewed a defamatory statement on the internet, because the appearance of the material in a State depends on an act of a *user*.

Accordingly, for a website operator or internet-services provider to be subject to specific personal jurisdiction in a State for claims arising

---

[3] Of course, even if the publisher did not sell its magazine in New Hampshire, an out-of-state traveler could have brought a copy there, where it would have had the same defamatory effect. But it is plain that there would be no personal jurisdiction over the publisher in such a case. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295–96 (1980). This version of the hypothetical is similar to an internet publication—the reason the material appeared in New Hampshire in this version is because of a reader-initiated transaction not connected to any forum-focused action by the publisher.

out of its general functionality, that provider must have taken some action beyond its baseline operations aimed at attracting or facilitating access in that State. Whether a particular action can support specific personal jurisdiction over a particular claim will generally be a fact-specific inquiry, but this Court should take the opportunity to announce and clarify some of the broader governing principles that will often be relevant in cases involving internet conduct.

*First*, an entity's general business connections in the State will not normally be relevant to the specific-personal-jurisdiction analysis. For instance, in this case, Briskin attempts to base personal jurisdiction over Shopify in part on the fact that Shopify operates fulfillment centers in California. *See, e.g.*, Briskin En Banc Br. 18. But Shopify's decision to operate such centers in the State has nothing at all to do with Briskin or the harms he allegedly suffered. The core difference between general and specific personal jurisdiction is that the latter requires a strong "affiliation between the forum and the underlying controversy." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 264 (2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). As the Supreme Court explained in *Bristol-Myers Squibb*, relaxing this

nexus requirement when the defendant has more significant forum-State contacts would "resemble[] a loose and spurious form of general jurisdiction." *Id.* The inquiry must instead be narrowly focused on the contacts *relevant* to the claims.

*Second*, and relatedly, little weight should be given to a website operator's or web-services provider's relationships with third parties. The operation of a web-based business involves a notoriously complex web of partners providing interrelated services.[4] And because of the nature of these services, the state of incorporation or headquarters for these partners will have little real-world relevance to the website operator's or web-services provider's actual business. Tallying up the number of partners a defendant has in a particular State does little to advance the ultimate inquiry: whether the defendant has availed itself of the privileges and benefits of doing business in a State such that it is fair to force it to litigate there on the claims asserted. *Accord Briskin II*, 87 F.4th at 420 ("Actions of third parties that the defendant does not control, even those

---

[4] *See LUMAscapes: A Visual Guide to the Digital World*, LUMA, https://lumapartners.com/lumascapes (last visited Aug. 2, 2024) (providing diagrams showing the relationship among the vast numbers of companies providing various aspects of internet services).

of the defendant's contractors, tend to be less reflective of the defendant's own express aiming toward the forum because they invite a greater degree of attenuation between the plaintiff's injuries and the defendant's jurisdictional contacts.").

*Third*, a back-end web-services provider (like Shopify) should not be subject to specific personal jurisdiction in the plaintiff's home State merely because the plaintiff is an end user who interacts with the provider's technology through an in-state intermediary. Because the back-end services provider's business is in dealing with website operators (here, merchants), rather than their users (here, Briskin and other shoppers), two things will typically be true. One, to the extent the provider has in-state connections, those will usually be unrelated to the plaintiff or his claims. And two, the fact that the plaintiff suffers an alleged injury in the forum State will usually be entirely due to the plaintiff's choice of where to access the website using the provider's software, as back-end services providers do not typically engage in any *user* targeting.

*Fourth*, the defendant's downstream use of data gathered from the plaintiff through a website should not lead to the conclusion that the defendant is subject to specific personal jurisdiction where the plaintiff

lives. As this Court has explained, there are three prongs to the "'effects' test" derived from *Calder v. Jones*, 465 U.S. 783 (1984): "[t]he defendant must have '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017) (quoting *Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 673 (9th Cir. 2012)). The use of a plaintiff's data is insufficient to show that the defendant "expressly aimed at the forum state." *Id.* That is because the harm to the plaintiff from such data use "is not the sort of effect that is tethered to [the forum State] in any meaningful way." *Walden*, 571 U.S. at 290. Instead, it is personal to the plaintiff and is suffered all the same wherever the plaintiff goes. *See id.*[5] While it may be relevant as to the third *Calder* prong, it is not relevant to the second.

*Fifth*, suits against websites and web services will generally involve facts distinguishable from those in *Ford Motor Co. v. Montana Eighth*

---

[5] *Walden* distinguished torts, like defamation, where the injury directly relates to publication of a statement in a particular area. *See* 571 U.S. at 290. But the misappropriation of personal information is "not connected to the forum State in [such] a way." *Id.*

*Judicial District Court*, 592 U.S. 351 (2021). In *Ford*, the Supreme Court held that a defendant is sometimes subject to specific personal jurisdiction in a State even when his in-state conduct bears no *causal* relationship to the plaintiff's claims, so long as those claims sufficiently "relate to" the defendant's in-state activities. *See id.* at 361–68. The Court did not, however, provide detail on what it means for a defendant's in-state activities to relate to a plaintiff's claims, other than to hold sufficient the company's very significant activities in the relevant States: sales, marketing, and service operations that "systematically served a market . . . for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States." *Id.* at 365.

Most notably, the Court observed that Ford could "'structure [its] primary conduct' to lessen or even avoid" the risk of being haled into the court in the forum (or any other) State. *Ford*, 592 U.S. at 368 (alteration in original) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). The Court reached this conclusion after detailing the primary conduct Ford undertook in the forum State, including advertising, stocking, and fostering a resale market for its tangible products. *See id.* at 365–68. The Court's suggested avenue of restructuring primary

16

conduct for vendors of physical goods, however, is obviously not a realistic alternative for internet activity; for this reason, the Court explicitly opted to keep similar questions about internet transactions unanswered. *See id.* at 366 n.4.

Because the facts of Ford's in-state conduct were essential to the Supreme Court's holding, and because the Court excluded internet transactions from the sweep of its opinion, this Court should hesitate to extend that case to internet conduct. In particular, *Ford* does not support a rule under which an internet-based company with California contacts (targeted to merchant relationships) could be subject to personal jurisdiction in California *regardless of the plaintiff's locale or the merchant's locale*. Because this case involves a California plaintiff *and* a California merchant, there is no cause to decide whether the outer reaches of *Ford*'s reasoning ought to apply to internet-based services more generally.

### B. This Court Should Clarify Its Case Law to Account for the Modern Realities of the Internet.

Several of this Court's personal-jurisdiction cases have turned on distinctions that are incompatible with both modern personal-jurisdiction case law and modern realities of the internet. In several respects,

the Court should clarify the standard for specific personal jurisdiction that applies in internet-related cases.

*First*, this Court should make clear that due-process protections do not turn on whether a website is "interactive" or "passive." Whether "interactive" or not, a website is not subject to personal jurisdiction in a State unless, at a minimum, it has expressly aimed its conduct at that State.

This Court's cases addressing specific personal jurisdiction in website cases have relied in part on a distinction, first drawn in the 1990s, "between 'passive' websites that merely make information available to visitors and 'interactive' websites, where 'users can exchange information with the host computer.'" *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1091 (9th Cir. 2023) (quoting *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997)), *cert. denied*, 144 S. Ct. 693 (2024); *see, e.g.*, *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1157 (9th Cir. 2006). As initially intended, that a website was "interactive" made it more likely that its operator would be subject to specific personal jurisdiction in a State where the user accessed the site.

But that interactive/passive distinction has not proven as useful or as clear as it was presumably intended. For example, this Court has explained that while "maintenance of a passive website alone cannot satisfy the express aiming prong" of the *Calder*-derived effects test, "[i]t is equally clear . . . that 'operating even a passive website in conjunction with "something more"—conduct directly targeting the forum—is sufficient to confer personal jurisdiction.'" *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1129 (9th Cir. 2010) (quoting *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002)). Thus, the fact that a website is passive has not been a barrier to specific personal jurisdiction. Nor has the fact that a website is deemed "interactive" automatically supported personal jurisdiction; as the Court (including the panel here) has recognized, the fact that a website is "interactive" is far from dispositive. *See Briskin II*, 87 F.4th at 417 ("[O]peration of an interactive website does not, by itself, establish express aiming." (quoting *Herbal Brands*, 72 F.4th at 1091)); *see also Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 319–20 (5th Cir. 2021) (interactivity of a website is insufficient to establish specific personal jurisdiction).

Whatever utility or accuracy this passive-versus-interactive framework had when describing the internet in the 1990s, it today neither breeds clarity nor reflects the reality of internet-based business. Few, if any, websites are completely passive—for one thing, most websites place cookies on their users' devices to assist with site navigation and to enhance the user experience.[6] And to the extent a website is "interactive" in the sense that it acts based on user prompts or collects information from users, those facts should play little role in the jurisdictional analysis, because they relate only to a connection between the website operator and the *user*, not the operator and the forum. Instead of the passive-interactive distinction, courts should ask whether the operator has taken steps to cultivate the geographic market in which the user is located, focusing on the operator's conduct *before* the user reaches the site.

*Second*, and relatedly, the Court should hold that it is irrelevant for purposes of personal jurisdiction whether the internet-based defendant performed some action based on the location of a user. The panel in this case observed "that Shopify alters its data collection activities based on

---

[6] *See* All About Cookies, https://allaboutcookies.org (last visited Aug. 2, 2024).

the location of a given online purchaser." *Briskin II*, 87 F.4th at 422. While that factual statement is accurate, the outcome should not have changed even if Shopify *did* alter its data-collection activities based on a purchaser's location. Whether a web-services provider alters its conduct in some way *in response* to the user's location is both altogether typical and entirely unrelated to the question of whether it has targeted the forum. For example, web software's calculation of sales tax and shipping costs will be a direct function of where a particular customer lives. But the fact that a website is programmed to account for a user's location after the user initiates an interaction does not suggest targeting of either the user, or his or her State of residence, in a constitutionally relevant sense.

*Third*, this Court has held at times that the requisite express aiming at a forum State may exist based on the facts that (1) a large number of users visit a website from a particular State, and (2) that those users thus generate a significant amount of advertising revenue for the defendant. *See, e.g.*, *Mavrix Photo*, 647 F.3d at 1230 ("The fact that the advertisements targeted California residents indicates that [the defendant] knows—either actually or constructively—about its California user base,

and that it exploits that base for commercial gain by selling space on its website for advertisements."). This aspect of the analysis should be jettisoned in light of certain modern realities of the internet and online advertising. Today, these are just the sort of "baseline connections" that the panel correctly observed cannot support specific personal jurisdiction. *Briskin II*, 87 F.4th at 420.

For one thing, most websites will tend to have a large California user base and, accordingly, advertising revenue. California, after all, is the most populous State, so websites and web-services providers will generally provide more views and services to California residents. It is wrong to suggest that a website with such a generalized focus has targeted California simply because of the predictability (and/or knowledge) of significant California viewership.

Second, website advertisements are routinely geotargeted by third parties, without need for any unusual intervention by the provider. Most online advertising is done programmatically, meaning space on a webpage is sold by third parties through real-time auctions based on

characteristics of the site and known information about the user.[7]  As

noted above, a user's IP address reveals his or her geographic location,

and this information is generally made available to potential third-party

advertisers, who use it to set their bids.  Because geotargeted advertising

occurs largely outside the control of the website operator, is entirely ubiq-

uitous, and has almost no bearing on whether the operator has directed

activities toward the forum State, this Court should reject geotargeted

advertising as a relevant consideration.  *Accord AMA Multimedia*, 970

F.3d at 1210–11 (defendant's "use of geotargeted advertisements and the

purported corresponding U.S. revenue" were insufficient to establish spe-

cific personal jurisdiction in the United States).  The contrary rule risks

creating sideshows and collateral litigation about the precise nature in

which a particular website's advertising operations worked at a particu-

lar time.[8]

---

[7] *See* Brock Munro, *What Is a Demand Side Platform (DSP) and How It Helps Publishers*, Publift (updated June 28, 2024), https://www.publift.com /blog/what-is-a-demand-side-platform-dsp.

[8] In clarifying the appropriate standards, this Court may wish to expressly abrogate the analysis in *Mavrix Photo*.  The panel in that case relied heavily on the predictability of a large California customer base and the fact that the defendant "exploit[ed] that base for commercial gain by selling space on its website for advertisements" through geotargeting.

## C.  The Panel's Analysis Was Correct.

The panel correctly applied the principles outlined above in concluding that Shopify is not subject to specific personal jurisdiction in California.

First, the panel correctly "narrow[ed]" the allegations to the conduct actually relevant to the suit. *Briskin II*, 87 F.4th at 413.  The panel explained that the specific-personal-jurisdiction analysis "is a claim-tailored inquiry that requires us to examine the plaintiff's specific injury and its connection to the forum-related activities in question." *Id.*  Here, Briskin alleged a host of Shopify connections to California that undoubtedly could support specific personal jurisdiction over *some* claims against Shopify.  For example, Shopify allegedly has "contracts with California merchants." *Id.*  A breach-of-contract action by one of those California merchants might thus properly be brought in California.

Here, however, Briskin's claims here "are based on Shopify's extraction and processing of his personal information"; they "have nothing to

---

*Mavrix Photo*, 647 F.3d at 1230.  Though the result in the case can perhaps be justified by the website's "specific focus on the California-centered celebrity and entertainment industries," the muddled analysis has caused confusion in subsequent cases.  *See, e.g.*, *AMA Multimedia*, 970 F.3d at 1209–12 (straining to distinguish *Mavrix*).

do with Shopify's brick-and-mortar operations in the state" or "Shopify's contracts with merchants in California." *Briskin II*, 87 F.4th at 414. Critically, though the merchant from whom Briskin made a purchase (and with whom Shopify has a contractual relationship) is allegedly based in California, Briskin does not allege that fact to have causally led to his injury. *See id.* ("Briskin would have suffered the same injury regardless of whether he purchased items from a California merchant . . . ."). As will often be the case with online transactions involving merchants that sell goods nationally, the technical detail of where the merchant is incorporated or headquartered played no role here in any relevant event. The panel correctly ignored Shopify's general California contacts and instead focused on "the activities . . . that caused Briskin's injuries: Shopify's collection, retention, and use of consumer data obtained from persons who made online purchases while in California." *Id.* at 415. And the panel correctly concluded that each of these relevant actions had an insufficient connection with California to justify a conclusion that "Shopify expressly aimed its activities toward" the State. *Id.*

Next, the panel properly rejected the relevance of Briskin's own California connections. *See Briskin II*, 87 F.4th at 416–17. As it

explained, under the principles elucidated in *Walden*, "Shopify did not expressly aim its conduct toward California simply because Briskin resided there, made his online purchase while located in California, and sustained his privacy-based injuries in that state." *Id.* at 416 (internal quotation marks omitted). Likewise, the panel was correct to discount Shopify's *knowledge* that its conduct would affect consumers in California. *See id.* at 417 ("Shopify did not expressly aim its conduct toward California 'simply because [it] allegedly directed [its] conduct at plaintiffs whom [it] knew had [California] connections.'" (alterations in original) (quoting *Walden*, 571 U.S. at 289)).

The panel also correctly stated that Shopify's requisite "'substantial connection' must be something substantial beyond the baseline connection that [its] internet presence already creates with every jurisdiction through its universally accessible platform." *Briskin II*, 87 F.4th at 420. As explained above, internet accessibility in a forum State differs fundamentally from physical presence or physical shipment of goods into that State.

Applying these principles, the panel correctly concluded that, with respect to the claims alleged here, Shopify is not subject to specific

26

personal jurisdiction in California. As the panel explained, Shopify takes no action specifically geared to facilitate interactions with end users in California. *See Briskin II*, 87 F.4th at 422–23. In particular, Shopify "did not prioritize consumers in California or specifically cultivate them," and Briskin's California presence had no effect on either Shopify's conduct or his own injury. *Id.* And the panel accurately observed that, even if Shopify targeted California *merchants*, "its extraction and retention of consumer data depends on" those merchants' "independent transactions," which "themselves do not depend on consumers being present in California." *Id.* at 423.

In its correct application of Supreme Court and Ninth Circuit precedent, the panel aligned this Court with the great weight of authority. Courts of appeals and district courts throughout the country routinely require plaintiffs bringing claims against internet-based defendants to demonstrate specific targeting of the forum State that goes beyond the baseline connections that an internet service necessarily creates with every State. For example, the Fourth Circuit has applied this standard to decline to exercise personal jurisdiction upon concluding that a defendant did not use its interactive website "to target South Carolina residents

in particular." *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 143 (4th Cir. 2020). And many other courts have applied the same (or similar) standard as the panel here in considering whether an internet-based defendant sufficiently targeted a forum State. *See, e.g.*, *Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 785 (5th Cir. 2021) ("Merely running a website that is accessible in all 50 states, but that does not specifically target the forum state, is not enough . . . ."); *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 843 (10th Cir. 2020) ("This court has followed the Supreme Court in requiring a particular focus by the defendant on the forum State . . . ."); *be2 LLC v. Ivanov*, 642 F.3d 555, 558–59 (7th Cir. 2011) ("Beyond simply operating an interactive website that is accessible from the forum state, a defendant must in some way *target* the forum state's market."); *Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171, 1178 (E.D. Ark. 2019) ("Twitter has operated a website and advertising platform that is accessible nationwide, with no specific targeting of Arkansas residents. These contacts are not sufficient . . . .").

28

## II.   The Specific-Personal-Jurisdiction Inquiry Should Turn on the Nature and Extent of a Defendant's Connection with the Forum State, Not Its Connections with Other States.

On grant of rehearing, this Court requested briefing on "[w]hether [it] should revisit [its] prior holdings that a defendant's aiming of its internet-related conduct at a jurisdiction must exceed its aiming at other jurisdictions to constitute 'express aiming' at that jurisdiction."  ECF No. 61, at 1 (May 23, 2024) (Suppl. Briefing Order).  To the extent this Court's precedents are understood to impose such a requirement, the Court should clarify that the specific-personal-jurisdiction inquiry is about the significance of the defendant's targeting of the forum State, taken by itself, and should not involve comparisons between the extent to which the defendant targets different States.

Consider, for instance, this Court's decision in *Will Co. v. Lee*, 47 F.4th 917 (9th Cir. 2022).  The question in *Will Co.* was whether the foreign defendants, who operated a website accessible worldwide, had a sufficient connection with the United States to justify specific personal jurisdiction in a U.S. forum for a copyright suit.  *Id.* at 922; *see* Fed. R. Civ. P. 4(k)(2).  The panel concluded that the defendants had expressly aimed their tortious conduct at the United States, relying in part on the fact

that they "chose to host the website in Utah and to purchase content delivery network services for North America, which reduced the time it takes for the site to load in the United States." *Will Co.*, 47 F.4th at 924; *see id.* ("The time it takes for a site to load, sometimes referred to as a site's 'latency,' is critical to a website's success."). The defendants were subject to personal jurisdiction in the United States because they had taken steps to increase access *in the United States specifically*. But if the defendants had taken similar steps in other countries, that should not have changed the calculus. That would simply mean that the defendants had targeted multiple countries, not *just* the United States.

Conversely, that a defendant has established *more* connections with the forum State than with other States does not mean it is necessarily subject to personal jurisdiction in the forum State. Imagine a web-services provider that placed a single advertisement in Flagstaff, Arizona, and none in any other State. It would be wrong to conclude that because there was one advertisement in Arizona and zero in other States, the provider necessarily "targeted" Arizona and is accordingly amenable to suit there. Rather, the analysis must focus on whether the defendant's in-

state contacts are constitutionally sufficient in their own right, not how they stack up against contacts in other forums.

### III. This Court Should Not Cut Back on Protections for Defendants Based on the Original Meaning of the Fourteenth Amendment.

This Court also requested briefing on "[w]hether and how the original meaning of the Fourteenth Amendment's Due Process Clause should inform [its] consideration of the issues in this case." Suppl. Briefing Order 1. In *amicus*'s view, this case should be resolved based on the doctrine that has developed under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).

*Amicus* understands that some scholars and Justices of the Supreme Court have called into question whether the protections for out-of-state corporate defendants provided by modern personal-jurisdiction doctrine—which have been grounded in the Fourteenth Amendment's Due Process Clause—are consistent with that clause's original meaning. *See Ford*, 592 U.S. at 375–84 (Gorsuch, J., concurring in the judgment); Stephen E. Sachs, Pennoyer *Was Right*, 95 Tex. L. Rev. 1249 (2017); Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703 (2020) (*Unlimited Jurisdiction*).

Still, as even some skeptics have recognized, even if the Due Process Clause is not the correct source of personal-jurisdiction protections that have evolved through the modern doctrine, that does not mean the Constitution does not offer those same protections through other provisions. For instance, the Supreme Court has often discussed how personal jurisdiction protects federalism concerns; the protections offered by the doctrine thus may "fall more naturally within the scope of the Commerce Clause." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 157 (2023) (Alito, J., concurring in part and concurring in the judgment); *see, e.g.*, *Ford*, 592 U.S. at 360 (noting that the rules of personal jurisdiction "derive from and reflect two sets of values—treating defendants fairly and protecting 'interstate federalism'" (quoting *World-Wide Volkswagen*, 444 U.S. at 293)). "Others suggest that fights over personal jurisdiction would be more sensibly waged under the Full Faith and Credit Clause." *Ford*, 592 U.S. at 379 n.2 (Gorsuch, J., concurring in the judgment) (citing Robert H. Jackson, *Full Faith and Credit—The Lawyer's Clause of the Constitution*, 45 Colum. L. Rev. 1, 3 (1945)); *see also* Sachs, *Unlimited Jurisdiction*, *supra*, at 1734 (explaining that if a State attempted to assert personal jurisdiction, "it might have to worry about unconstitutional

conditions, dormant commerce limits, the privileges-and-immunities 'right to travel,' and so on"). And it has also been suggested that "[a] State's assertion of jurisdiction over lawsuits with no real connection to the State may violate fundamental principles that are protected by . . . the very structure of the federal system that the Constitution created." *Mallory*, 600 U.S. at 150 (Alito, J., concurring in part and concurring in the judgment).

It is not unusual for Supreme Court doctrines to develop around a particular clause of the Constitution, only for it to be called into question later whether the doctrine might be better housed in a different provision. *See, e.g.*, *Timbs v. Indiana*, 586 U.S. 146, 157–58 (2019) (Thomas, J., concurring in the judgment) ("Instead of reading the Fourteenth Amendment's Due Process Clause to encompass a substantive right . . . , I would hold that the right to be free from excessive fines is one of the 'privileges or immunities of citizens of the United States' protected by the Fourteenth Amendment." (quoting U.S. Const. amend. XIV, § 1)); *cf. Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 408 (2023) (Kavanaugh, J., concurring in part and dissenting in part) ("[S]tate laws like Proposition 12 implicate not only the Commerce Clause, but also potentially several

other constitutional provisions, including the Import-Export Clause, the Privileges and Immunities Clause, and the Full Faith and Credit Clause."). *Amicus* respectfully submits that, instead of attempting to unravel eighty years of personal-jurisdiction doctrine that has developed around the Due Process Clause, this Court should take that doctrine as it comes, especially given that the protections it grants may well be available just the same under other constitutional provisions.

# CONCLUSION

The judgment of the district court should be affirmed.


Dated:  August 2, 2024

*/s/ Adam G. Unikowsky*

Adam G. Unikowsky
  *Counsel of Record*
Jonathan J. Marshall
JENNER & BLOCK LLP
1099 New York Ave., N.W.,
  Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

Jennifer B. Dickey
Jonathan D. Urick
Kevin R. Palmer
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for Amicus Curiae*
*The Chamber of Commerce of the*
*United States of America*

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)**  22-15815

    I am the attorney or self-represented party.

    **This brief contains 6,763 words,** excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

    I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[  ] it is a joint brief submitted by separately represented parties.

[  ] a party or parties are filing a single brief in response to multiple briefs.

[  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Adam G. Unikowsky*          **Date** August 2, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be effected through the CM/ECF system.

Dated: August 2, 2024              */s/ Adam G. Unikowsky*
                                   Adam G. Unikowsky

                                   *Counsel of Record for Amicus*
                                     *Curiae The Chamber of Commerce*
                                     *of the United States of America*