## Case No. 22-15815

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

BRANDON BRISKIN,
on behalf of himself and those similarly situated,
*Plaintiff-Appellant,*

v.

SHOPIFY INC.; SHOPIFY (USA) INC.;
SHOPIFY PAYMENTS (USA) INC.,
*Defendants-Appellees.*

---

*Appeal from the United States District Court for the Northern District of California (Oakland),
Case No. 4:21-cv-06269-PJH · Honorable Phyllis J. Hamilton, Senior District Judge*

## BRIEF OF *AMICUS CURIAE*
## BRIGHT DATA, LTD. IN SUPPORT OF APPELLEES

COLIN KASS
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 416-6800
ckass@proskauer.com

DAVID A. MUNKITTRICK
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
Telephone: (212) 969-3000
dmunkittrick@proskauer.com

*Attorneys for Amicus Curiae Bright Data, Ltd.*

 COUNSEL PRESS · (213) 680-2300          PRINTED ON RECYCLED PAPER 

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Bright Data, Ltd. states that (i) IPPN Holdings Ltd., an Israel private company, is the parent company of Bright Data, Ltd.; and (ii) no publicly held corporation currently owns 10 percent or more of Bright Data, Ltd. or IPPN Holdings Ltd.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..........................................i

TABLE OF AUTHORITIES ................................................... iii

STATEMENT REQUESTING ORAL ARGUMENT .............................. v

BRIGHT DATA'S STATEMENT OF INTEREST .................................1

SUMMARY OF ARGUMENT .................................................4

I.      THE DUE PROCESS CLAUSE LIMITS THE POWER OF
        DIVERSITY COURTS TO REGULATE THE INTERNET. .......................8

II.     THE PANEL'S TWO-PART TEST FOR INTERNET-BASED
        ACTIVITY PROMOTES FAIRNESS AND FEDERALISM. ....................12

        A.      Step 1:  The Direct Nexus Test. .........................................12

        B.      Step 2:  Forum Prioritization. .............................................20

CONCLUSION ..................................................................26

CERTIFICATE OF COMPLIANCE.......................................................28

CERTIFICATE OF SERVICE ...............................................29

## <u>TABLE OF AUTHORITIES</u>

CASES                                                         PAGE(S)

*Advanced Tactical Ordnance Sys., LLC, v. Real Action Paintball, Inc.*,
   751 F.3d 796 (7th Cir. 2014) .................................................................21

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996)........................................................................24

*Briskin v. Shopify, Inc.*,
   87 F.4th 404 (9th Cir. 2023) ......................................................*passim*

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
   582 U.S. 255 (2017)........................................................................13

*Doe v. WebGroup Czech Republic, A.S.*,
   93 F.4th 442 (9th Cir. 2024) ......................................................10, 11

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982)........................................................................25

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021).................................................................*passim*

*Herbal Brands, Inc. v. Photoplaza, Inc.*,
   72 F.4th 1085 (9th Cir. 2023) ........................................................19

*Ins. Co. of N. Am. v. Marina Salina Cruz*,
   649 F.2d 1266 (9th Cir. 1981) ......................................................24

*J. McIntyre Machinery, Ltd. v. Nicastro*,
   564 U.S. 873 (2011)..............................................................10, 25, 26

*Johnson v. TheHuffingtonPost.com, Inc.*,
   21 F.4th 314 (5th Cir. 2021) ..........................................................14

*Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*,
   313 U.S. 487 (1941)........................................................................10

*Walden v. Fiore*,
   571 U.S. 277 (2014)..............................................................8, 14, 22

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)......................................................................................9

*Yamashita v. LG Chem, Ltd.*,
    62 F.4th 496 (9th Cir. 2023) .................................................................17

**STATUTES**

U.S. Const., Art. I, §8 .................................................................................10

**OTHER AUTHORITIES**

Douglas Laycock, *Equal Citizens of Equal and Territorial States*, 92
    Colum. L. Rev. 249 (1992)....................................................................25

## STATEMENT REQUESTING ORAL ARGUMENT

Given Bright Data's substantial and unique interest in this case, including the preclusive effect any ruling may have on Bright Data's pending motion for interlocutory appeal, Bright Data requests the opportunity to present oral argument.

## **BRIGHT DATA'S STATEMENT OF INTEREST**

Bright Data has a unique interest in this case, as its own appeal on identical personal jurisdiction issues may be just a few months away.  Indeed, this Court's ruling may profoundly affect Bright Data's pending motion for interlocutory appeal in the Northern District of California, as a matter of *stare decisis*.  For that reason, Bright Data respectfully requests the opportunity not only to submit this brief, but to present oral argument.[1]

Bright Data operates a global, internet-based communications network. Based in Israel, it allows users from around the world to anonymously search the web, wherever in cyberspace those websites may be located.  In common parlance, Bright Data offers a virtual proxy network.  Its network operates the same way in every zip code, state, and country in the world.

Bright Data was recently sued in two separate cases, both filed in the Northern District of California, by two social media platforms:  Meta, which operates Facebook and Instagram; and X, which operates the service previously known as Twitter.  Both claimed that Bright Data's network violates California law because third parties allegedly misused the network to scrape public information that Meta

---

[1] All parties consented to the filing of this brief.  Counsel for *amicus* authored the brief in whole, and certifies that no party other than *amicus* made any monetary contributions intended to fund the preparation or submission of this brief.

1

and X made available for the world to see. Though the information was public, both claimed that these third parties violated their Terms of Use, and that Bright Data was secondarily liable under California tort law.

Bright Data challenged the court's personal jurisdiction in both cases, based largely on the panel's *Shopify* decision. Rather than respond, Meta dismissed its claim. X, however, continued to litigate. After the district court found jurisdiction, Bright Data moved to certify the issue for interlocutory appeal because – in Bright Data's view – the court did not properly apply *Shopify*'s two-part test, making it an outlier among all the other post-*Shopify* decisions. Before ruling on that motion, however, the district court dismissed X's claim *on the merits* without prejudice, holding Bright Data's motion for interlocutory appeal in abeyance. If X amends its complaint, as it has indicated it will, Bright Data's motion will again be ripe.

Apart from currently litigating the identical issue, Bright Data has a strong, vested interest in the anti-balkanization of the internet—a principle at the heart of the panel's decision. Bright Data's position is simple: While Congress can regulate the internet nationwide, and individual states may freely regulate *resident* internet platforms, state courts – and, by extension, federal courts sitting in diversity – can only regulate *non-resident* platforms if (i) there is "*direct nexus*" between the non-resident's forum conduct and the plaintiff's claim; and (ii) the claim challenges some

2

forum-*prioritized* internet activity. The panel's *Shopify* decision exemplifies the proper test.

Bright Data will suffer significant harm if the Court departs from this test. Subjecting Bright Data to suit in every jurisdiction where a user or *any* searched website may be located creates an untenable situation. Bright Data's global communications network allows customers all over the world to communicate with websites whose operators are domiciled in every jurisdiction. So, if Bright Data can be sued in California based on its users' alleged misdeeds, it can be sued everywhere. The *in terrorem* effect of allowing anyone, anywhere, to sue Bright Data **for communications that occur in cyberspace** is chilling.

If the Court reverses the panel's decision, bad things will happen to Bright Data. The internet will no longer be a borderless resource available for all citizens to use, but rather would become a state-specific service contrary to the national market principles animating the Constitution. The innovation that has driven the growth of the internet will be stifled, as platforms – like Bright Data – succumb to the "lowest common denominator." Whether due to technical or financial limitations, Bright Data will need to conform to the most restrictive State's laws, no matter Bright Data's connection to the State, giving those States power far beyond anything the Founders envisioned. Due process forbids giving States, their courts, or federal courts **sitting in diversity** such power.

3

## SUMMARY OF ARGUMENT[2]

This case presents a simple question: Can state courts regulate non-resident, non-prioritized, universally accessible internet platforms? The answer is no.

Though often framed in terms of "fairness," the Due Process Clause's personal jurisdiction requirements reflect something even more profound: the limits of a State's power to regulate foreign internet platforms. While Congress can regulate internet access across the country, States do not command such unfettered power. They cannot balkanize the internet.

At issue here is a "universally accessible" internet platform, and alleged conduct limited to cyber-communications devoid of physical connections to the forum. Shopify did ***nothing*** more than connect its servers to the internet and collect information *via the web* from users who chose to use its services. It did not change, alter, or tailor its services for California users in any way. In the panel's words, Shopify did not go "beyond the baseline connection that the defendant's internet presence already creates with every jurisdiction through its universally accessible platform." *Shopify*, at 420-22. This is not disputed.

---

[2] Unless otherwise specified, all emphasis added, capitalization and punctuation conformed without brackets, and internal citations and quotation marks omitted. References to "*Shopify*, at __" refer to the panel's decision, found at *Briskin v. Shopify, Inc.*, 87 F.4th 404, __ (9th Cir. 2023).

This case, therefore, presents the question of which State's laws may set the baseline: Is it the defendant's home State, or the most restrictive State where the site may be accessed? The answer is clear. States may not force non-resident internet platforms to shut down their universally accessible websites in favor of State-specific versions tailored to the judicial decisions of local courts.

The Due Process Clause limits the power of a State to regulate *non-resident* internet service platforms. Were it otherwise, the internet would fall victim to lowest common denominator syndrome, where every website in the world must comply with the most restrictive State's laws. States desiring to give their citizens access to a freer, unfettered internet would be powerless to prevent the race to the bottom, which instead will be dictated by those States bent upon flexing their regulatory muscle to control access to information in the Information Age. The Due Process Clause does not countenance that.

Only one State – the home State – may set the "baseline" rules that govern universally accessible internet platforms. Only home States possess the "awesome power" of *general* jurisdiction to regulate its residents' global conduct as they see fit. States do not enjoy the same privilege over non-residents, and cannot, through *specific* jurisdiction, encroach upon the sovereignty of their sisters by regulating beyond their borders.

The panel decision recognizes these jurisdictional limits, and fully implements the Due Process Clause's twin goals of fairness and federalism. The panel established a simple two-part test governing universally accessible internet platforms. Under this test, specific jurisdiction over non-resident internet platforms only lies where (i) the plaintiff's claim bears a "direct nexus" to the defendant's forum-related activities, *and* (ii) the claim is tied to some forum-specific aspect of the defendant's service.

Step 1 of the test – the direct nexus prong – serves two salutary purposes. *First*, it demarcates the line between general and specific jurisdiction. That line confers upon the home State the power and privilege to set baseline rules for their resident internet platforms, while ensuring that non-resident platforms are only hauled into local courts if there is a "strong, direct connection between the defendant's forum-related activities and the plaintiff's claims." *Shopify*, at 414. Such a "***strong relationship*** among the defendant, the forum, and the litigation," the Supreme Court has declared, is "the *essential foundation* of specific jurisdiction." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 365 (2021). It should be respected.

*Second*, the direct nexus prong enables courts to develop jurisdictional rules tailored to the situation at hand. In essence, it draws boundaries around the panel's opinion, limiting its reach to like cases. Since the dawn of the internet, the Supreme

Court recognized the need to develop special jurisdictional rules for cyberspace, but it left it to the lower courts to fill the void. To carry out this mandate, courts will need to define the factual scenarios to which each new rule applies. Enter the "direct nexus" test. It ensures that the panel's prioritization prong (step 2) comes into play only after the court finds (in step 1) that website activity is the ***only*** jurisdictionally-relevant conduct. By serving this gatekeeper function, the direct nexus prong obviates slippery slope concerns about applying the prioritization prong to conduct beyond virtual connections in cyberspace.

Here, data collection via the web is a quintessential cyberspace activity, so the panel's second prong – prioritization – applies. That test gives full effect to the Due Process Clause's twin goals of fairness and federalism. As to fairness, the prioritization prong both protects defendants who do nothing more than connect their servers to the internet, and prevents discrimination among potential plaintiffs based on *claim-irrelevant* vagaries of the defendant's server locations or marketing efforts. As to federalism, the prioritization prong preserves home State sovereignty to set "baseline" rules governing their residents' universally accessible websites, while allowing other States to regulate ***customized*** conduct aimed at those fora.

In this way, the panel's two-part test ensures that non-resident website operators will not be forced to tailor their services to a patchwork of local regulations

7

that could spell the demise of a free, open, and universally accessible internet. The *en banc* Court should embrace the panel's test.

## I. THE DUE PROCESS CLAUSE LIMITS THE POWER OF DIVERSITY COURTS TO REGULATE THE INTERNET.

The internet is a global communications network. It operates without borders, enabling anyone with an internet connection to communicate with any other person so connected, wherever they may be. Local regulation is anathema to the success of the greatest invention the world has ever known.

We are not here dealing with physical contact or actual presence in a State, or even the shipment of goods into the State sold via the internet. Disembodied from the physical world, the connections here occur only in cyberspace, through the exchange of coded electrons as they pass through the ether from server to server. To be sure, those electrons can be incredibly important. But importance does not answer the jurisdictional question. As the Supreme Court has recognized, "very different questions" govern personal jurisdiction when the claims are based on "a defendant's virtual presence" in a State. *Walden v. Fiore*, 571 U.S. 277, 290, n.9 (2014); *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 366, n.4 (2021) (noting, but not resolving, the different "doctrinal questions" raised by internet commerce).

At its core, this case concerns an issue no less fundamental than who gets to regulate the internet. We are a nation of 51 sovereigns. While many cases focus on "fairness" to the defendant of being hauled into faraway local courts, fairness is not

8

the only interest animating the Due Process Clause. The "concept of minimum contacts … can be seen to perform two related, but distinguishable, functions:"

> "It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And *it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system*."

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980); *see also Ford*, 592 U.S. at 360 (personal jurisdiction "rules derive from and reflect two sets of values – treating defendants fairly and protecting interstate federalism.").

As such, "even if the forum State has a strong interest in applying its law to the controversy [and] even if the forum State is the most convenient location for litigation, the Due Process Clause, *acting as an instrument of interstate federalism*, may sometimes act to divest the State of its power to render a valid judgment." *Volkswagen*, 444 U.S. at 294.

These federalism principles have both "vertical" and "horizontal" components, both of which are implicated by the panel's decision. Vertically, this Court's jurisdictional rules must give due regard for the distinction between Congress's ability to regulate the internet and a State's power to do so. And horizontally, those rules must also ensure that no State encroaches on the regulatory power of other States.

These dual federalism vectors mean that jurisdictional rules differ based on whether a federal court is sitting in diversity or whether it is exercising federal

question jurisdiction. Because a diversity court stands in the shoes of its state court brethren, its jurisdictional reach extends no further than the State's. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 497 (1941). In contrast, Congress has plenary power to "regulate commerce with foreign nations [and] among the several states." *See* U.S. Const., Art. I, §8. So, federal question courts can regulate the internet without regard to territorial limits.

That a "a defendant may … be subject to the jurisdiction of the courts of the United States but not of any particular State" is important to bear in mind as the Court develops jurisdictional rules for the internet. *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011). Though diversity courts have sometimes looked to federal question cases for guidance, and vice versa (often without acknowledging the distinction), this Court should be careful not to borrow too freely from federal question precedents here because this case is grounded in diversity, which presents vastly different federalism concerns.

Indeed, the failure to recognize this distinction could lead the Court astray. For example, it might lead the Court to conclude that either the panel in this case or the panel in *Doe*, a case decided just weeks later, erred, when in fact neither did. *See Doe v. WebGroup Czech Republic, A.S.*, 93 F.4th 442 (9th Cir. 2024). Factually, the conduct in both cases was indistinguishable, but the outcomes were polar opposites.

10

Yet neither was wrongly decided. Why? Because *Doe* arose under federal law, and *Shopify* did not.

In *Doe*, the plaintiff was a California resident, part of the tortious conduct (the underlying abuse) occurred in California, and the defendant contracted with California-based entities to provide its services. The plaintiff conceded that these facts did not confer state court jurisdiction. But that did not end the inquiry because a federal court may exercise specific jurisdiction over claims that "***arise[] under federal law***" based on a platform's U.S. contacts even where it is not "subject to jurisdiction in any state's courts." 93 F.4th at 450. Indeed, though most of the defendant's U.S. contacts were California contacts, the court could only exercise *pendent* jurisdiction over the state law claims. *Id.* at 450, n.5. That is, it lacked original diversity jurisdiction over the global internet platform.

This is consistent with the *Shopify* panel's decision a few weeks earlier. There, too, the plaintiff was a California resident, part of the tortious conduct (the underlying data collection) occurred in California, and the defendant contracted with California-based entities to enhance its services. Factually, it was on all fours. But the claim arose under state law, so the court, sitting in diversity, only had the jurisdictional reach of California state courts. Put simply, the *Doe* panel's decision was based only on fairness, while the panel's decision here was grounded in fairness

11

*and* federalism.  Those principles compel adoption of the panel's two-part test for state court regulation of the internet.

## II. THE PANEL'S TWO-PART TEST FOR INTERNET-BASED ACTIVITY PROMOTES FAIRNESS AND FEDERALISM.

In a matter of "first impression," the *Shopify* panel adopted a rigorous two-part test for determining when state courts can exercise jurisdiction over non-resident internet activity.  Under this test, courts are directed to first narrow their focus to only those facts that bear a "direct nexus" to the claim, and then, if "the website itself is the ***only*** jurisdictional contact," to determine whether it exhibits a "forum-specific focus … beyond the baseline connection that the defendant's internet presence already creates with every jurisdiction through its universally accessible platform." *Shopify*, at 413, 418-20.

This test approaches the jurisdictional inquiry with a scalpel, addressing ***only*** situations in which geographically *undifferentiated* internet activity – and nothing else – is being directly regulated by the state court.  To fully appreciate the wisdom of this test, we describe it in more detail.

### A.    Step 1:  The Direct Nexus Test.

Step 1 of the panel's test requires a "direct nexus … between a defendant's contacts with the forum State and the cause of action." *Shopify*, at 413-14 (citing cases).  This step serves two distinct functions:  It maintains the line between specific

and general jurisdiction, and narrows the application of the panel's opinion to only cases that involve *pure* internet activity and no other suit-related forum conduct.

*The Direct Nexus Test Appropriately Distinguishes Between Specific and General Jurisdiction.* Embedded in our federal system is the distinction between specific and general jurisdiction. While a State has the power to regulate the affairs of its residents for "any and all claims" concerning "events and conduct anywhere in the world," where a "defendant is not 'at home,' … the forum State may exercise jurisdiction … only" where the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Ford*, 592 U.S. at 358-59; *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 264 (2017).

This distinction between general and specific jurisdiction promotes both fairness and federalism by ensuring that States can *fully* regulate at-home internet service platforms, while other States can only regulate such conduct if there is an "adequate link between … the forum and the specific claims at issue." *Bristol-Myers*, 582 U.S. at 264-65. Because this dividing line is central to allocating regulatory power among the several States, there is "no support" for any approach to specific jurisdiction that "resembles a loose and spurious form of general jurisdiction." *Id*. A clear line is required. For that reason, courts may not use a "sliding scale" in which substantial forum conducts *unrelated* to the claim at issue can overcome a paucity of conduct specifically related to the claim. *Id*.

13

Accordingly, the "defendant's ***suit-related conduct*** must create a substantial connection with the forum State." *Walden*, 571 U.S. at 284. This requires courts to narrow the inquiry to suit-related conduct. That is exactly what the panel did when it began "by narrowing Briskin's allegations to the conduct relevant to the specific jurisdiction inquiry." *Shopify*, at 413.[3]

Neither Briskin nor his *amici* dispute that the Court can only consider "suit-related" conduct. Instead, they contend that the panel's requirement – that the conduct bear a "strong, direct connection between the defendant's forum-related activities and the plaintiff's claims" – injects into the analysis a "but-for" causation standard rejected by the Supreme Court in *Ford*. In their view, any connection – even if tenuous – can be deemed claim-related for jurisdictional purposes.

But the panel's "direct nexus" test does not require "*but-for*" causation, and *Ford* did not impose a "weak connections" test. To the contrary, it said that a "***strong 'relationship*** among the defendant, the forum, and the litigation' [is] the '*essential foundation*' of specific jurisdiction." *Ford*, 592 U.S. at 365.

---

[3] The panel is in good company. In *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 323-24 (5th Cir. 2021), the Fifth Circuit found specific jurisdiction lacking for claims relating to publication of an online article because the defendant's sale of merchandise in the forum was unrelated to the harm. "Exercising jurisdiction" in such a case, the court held, "would collapse the distinction between specific and general jurisdiction," and "vitiate the sovereign interests of the states where defendants like HuffPost are 'at home.'" *Id*. (describing general jurisdiction as an "awesome power" reserved for home States).

To be sure, if there is "but-for" causation, the "arising out of" portion of the specific jurisdiction formulation will likely be met.[4]  *See Shopify*, at 414-15.  But as the panel recognized, conduct that is sufficiently "*related*" to the claim can also satisfy the direct nexus test.  Thus, the question before the panel was not whether Shopify's "broader business actions" were a "but-for" cause of plaintiff's claim; it was whether such antecedent activities were "suit-related."  In concluding that Shopify's "brick and mortar" operations and its dealings with merchants – which at most exhibited a "butterfly effect" that "set the wheels in motion" for plaintiff's injuries – were not so related, the panel did not evade *Ford*, but rather applied it.

The *Ford* plaintiffs were forum residents who purchased defective *used* cars *in the forum* from third-parties that had previously bought them new elsewhere. *Ford*, 592 U.S. at 357.  At issue was whether the mere fact that the "first sale" occurred in a different State precluded jurisdiction.  *Id.* at 362.  Declining to adopt a rigid "first sale" rule, the Court said that, by "systematically serv[ing] a market in [the forum] for the **very vehicles** that plaintiffs alleged malfunctioned and injured them," Ford engaged in sufficient suit-related conduct in the forum regardless of where the first sale occurred.  *Id.* at 365.

_____

[4] In fact, the "arising out of" prong is more akin to "proximate cause."  For example, the existence of life on earth is not jurisdictionally-relevant despite being a "but-for cause" of almost everything that occurred thereafter.  That, however, is an issue for another day.

15

Central to the Court's decision was the fact that Ford sold the *identical* "models" – Crown Victorias and Explorers – in the forum. *Id*. at 362, 365-67. Reiterating that the concept of relatedness has "real limits," the Court "contrast[ed]" this situation with one where a manufacturer only sells ***other*** models in the forum. *Id*. Notably, Justice Gorsuch would have found jurisdiction even in that circumstance because Ford is "a nationwide corporation" selling cars in every State. *Id*. at 362, n.3. The majority, however, expressly rejected that approach because "[r]emoving the need for any connection between *the case* and the forum State would transfigure our specific jurisdiction standard" in which "[c]ase-linked jurisdiction … would then become not case-linked at all." *Id*.

Though the Court rejected reliance on Ford's broader business activities *per se*, the Court nonetheless found a strong relationship between conduct and claim because Ford's forum activities could have induced *plaintiffs* to purchase or maintain their vehicles in the forum "even though the cars at issue were first sold [to others] out of state." *Id*. at 367. In the Court's view, a rigid "first sale" rule ignores the fact that Ford actively sought to create a market in the State for the used vehicles at issue by advertising and marketing the same models, selling replacement parts, and "stand[ing] ready to service" them. Indeed, who but the most ardent mechanics or collectors would buy a used car if the manufacturer stopped selling parts for it? Because plaintiffs' claims stemmed from their purchase and continued operation of

16

the defective vehicles, Ford's effort to "foster ongoing connections" with *resident* car owners – *including the plaintiffs* – bore a sufficient relationship to the claim, rendering further jurisdictional allegations of causation unnecessary.[5] *Id*. at 365.

The panel's decision here is consistent with *Ford*. The complained-of-conduct – collecting personal information via the internet – occurred both within and outside the forum, and was properly considered "suit-related." *Shopify*, at 422. But its "broader business activities" – such as the operating warehouses and sales offices – were not challenged conduct and were too tangential to be "suit-related." *Id.* at 414. This is not because the panel imposed a "but-for" causation requirement, but because the forum contacts were *different in nature* from the conduct at issue.

**The Panel's Direct Nexus Test Facilitates the Creation of Narrow Jurisdictional Rules for the Internet.** By focusing on suit-related conduct with a "strong, direct connection" to plaintiff's claims, the panel did more than distinguish general from specific jurisdiction. *Shopify*, at 414. It created a filter enabling the

---

[5] A panel of this Court has interpreted *Ford* as employing a "causation-by-proxy" test. *See Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 503-06 (9th Cir. 2023). But that too misreads *Ford*. Cars are durable goods involving robust *resale* and *service* markets that Ford nurtured *in the forum*. The *Ford* plaintiffs' injuries flowed from their participation in both markets; and thus, it was not just a case where "injuries like that of the plaintiff" were "similar injuries" that would have been caused to *others* where the first sale occurred there. *Id.* Its misreading of *Ford* aside, *Yamashita* properly rejected consideration of broader business activities, as it found jurisdiction lacking where the defendant sold batteries in the forum, but not the specific type that caused plaintiff's injuries.

17

Court to fashion appropriate rules where "the website itself is the *only* jurisdictional contact." *Id.* at 418 (emphasis in original). In this way, the direct nexus test *limits* the application of the panel's decision to cases where a final judgment would directly regulate the internet.

Before *Shopify*, courts struggled to develop generally applicable rules that could govern both virtual and more conventional contacts. Though the Supreme Court recognized the internet requires different rules, it looked to the lower courts to develop them. With little to guide them, the lower courts' early efforts to grapple with this issue rested largely on imperfect analogies to the physical world, creating a body of irrelevant or technologically outdated distinctions about website "passivity" or the fortuitous placement of owned or rented third-party server farms. None of this was doctrinally satisfying. And none of it could stand the test of time.

To solve this problem, the panel recognized that, to develop specific jurisdictional rules governing the internet, it must first isolate the factual circumstances to which internet jurisdictional rules would apply. The "direct nexus" test performs that filtering task. It recognizes that, while the internet may have changed virtually every facet of our way of life, it has not affected all conduct or all claims equally. That the internet may be tangentially involved is no reason to depart from old school jurisdictional rules. But by the same token, it makes no sense to deploy anachronistic *lex loci* rules to regulate the Cloud.

18

Tracing this fine line, the "direct nexus" test focuses on the gravamen of the claim, asking whether the claim-related conduct occurs in cyberspace or the physical world. This not only gives effect to the Supreme Court's repeated insistence that internet-based jurisdiction be separately considered, it mitigates any slippery slope concerns about applying such rules to real-world physical contacts.[6]

Indeed, by distinguishing between types of claims, the panel's test can somewhat counter-intuitively expand jurisdiction, rather than restrict it. That test would, for example, **_permit_** the exercise of jurisdiction "if a defendant … sells a physical product via an interactive website and causes that product to be delivered to the forum." *See Shopify*, at 421. Though the internet is central to the claim, because it also involves *suit-related physical* conduct, the prioritization test would not apply.

Indeed, the panel specifically distinguished *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1088 (9th Cir. 2023), on that basis.[7] There, an unauthorized distributor infringed the plaintiff's trademarks and violated the

---

[6] For example, the Borchers and Hay *Amici* criticize the panel's decision for supposedly allowing a hypothetical *snail-mail* letter bomber to escape having to answer for the resulting *physical* injuries. Dkt. 72 at 19-20. But the purpose of the "direct nexus" test is to distinguish that scenario and to limit its holding to non-customized, universally accessible internet platforms.

[7] Because *Herbal Brands* involved federal question jurisdiction (where only fairness, not federalism, concerns are at play), it could also have been – but was not – distinguished on that basis.

Lanham Act by selling physical goods into the forum via "an interactive website." *Id*. As a matter of "first impression," the court held that, while the use of the website was involved, it nonetheless had specific jurisdiction because the alleged *illegal act* involved the shipment of product into the forum. *Id.*

In contrast, there was no *suit-related* physical contact in *Shopify*. Of course, there were some similarities—Shopify, like Herbal Brands, was an ecommerce platform and it shipped goods from physical warehouses in California. But those physical contacts had nothing to do with the challenged data collection activities. The claim in *Shopify* sought to directly regulate the virtual world, not Shopify's activities IRL ("in real life"). And as such, internet-specific jurisdictional rules govern, bringing us to step 2 of the panel's decision.

### B.   Step 2:  Forum Prioritization.

Having found that the only jurisdictionally "pertinent" conduct involved internet communications – specifically, data collection – the panel focused its inquiry on whether the defendant's conduct went "beyond the baseline connection that the defendant's internet presence already creates with every jurisdiction through its universally accessible platform." *Shopify*, at 420-22.

Recognizing the "need to draw some lines to avoid subjecting web platforms to personal jurisdiction everywhere," the panel held that universally accessible national or global platforms could only be regulated by state courts either in their

home territory, or outside of it if the "suit-related conduct" reflected "some prioritization," "dedication," or "differentiation" of the forum over "other locations." *Id*. at 417-20. This prioritization prong promotes both fairness and federalism in the unique context where *all* jurisdictionally-relevant conduct occurs in *cyberspace*.

*The Panel's Prioritization Prong Promotes Fundamental Fairness*. As with any global communications network, individuals who send or receive information through the internet can be located anywhere. Attempting to divine the *lex loci* of that communication – and whether it occurs where the sender is, the receiver is, or somewhere in between – is a fool's errand. It is a metaphysical question with no clear answer, serves no purpose, and does not address what constitutes "traditional notions of fair play and justice" in the Internet Age.

Indeed, the location of internet-based interactions is largely irrelevant, fortuitous, or random. *Advanced Tactical Ordnance Sys., LLC, v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014) ("The connection between the place where an email is opened and a lawsuit is entirely fortuitous" [because] "email does not exist in any location at all; it bounces from one server to another… and it winds up wherever the recipient happens to be at that instant."). The same applies to the collection of personal information or scraping of public websites; the alleged

injury *arguably* occurs where the plaintiff is located.[8]  But a plaintiff cannot *create* jurisdiction through its *own* conduct because jurisdiction "must arise out of contacts that the 'defendant ***himself*** creates with the forum." *Walden*, 571 U.S. at 284 (2014) (emphasis in original).

Where a website operator – say in Mongolia – does nothing more than connect its servers to the internet, it has not stepped foot into any U.S. zip code or availed itself of the protections of the laws of every State where a *user* chooses to visit the website.  Indeed, it is arguably the *plaintiff* who has traveled away from home when it visits the Mongolian site.  To find jurisdiction in this context would let plaintiffs manufacture jurisdiction through their *own* unilateral acts.

Nor is it any answer that the defendant should have foreseen that, by connecting to the internet, it was subjecting itself to suit everywhere.  Of course, once a court says it has jurisdiction, it becomes "foreseeable" that the court will claim jurisdiction in like cases.  But such circular reasoning is no way to fashion jurisdictional rules.  Nor is foreseeable injury sufficient.  That may be an element of plaintiff's claim *on the merits*, but it is not the jurisdictional touchstone.  The *defendant* must still have done something to avail itself of the jurisdiction's protections.  *Walden*, 571 U.S. at 284.

---

[8] It is probably more accurate to say that the injury occurs where the data extraction occurs, though where that may be is not always clear.

Nor does it matter where the defendant locates its servers. Consider, for example, two plaintiffs – one in Alabama, one in Utah – complaining about the defendant's data extraction. Should one be able to sue locally, while the other is deprived of that opportunity, just because the defendant rented server space in one of these States, but not the other? Electrons travel at close to the speed of light, so server location has little bearing on the merits of any data extraction claim. Indeed, where websites operate the same everywhere, drawing fictional distinctions based on server locations would *undermine* traditional notions of fairness by discriminating among potential plaintiffs for no good reason.

The panel's requirement – that the defendant do "something more" to "create[] a substantial connection with the forum … beyond the baseline connection that the defendant's internet presence already creates with every jurisdiction" – ensures fundamental fairness by requiring not just foreseeability, but availment. *Shopify*, at 420-22. The panel's decision leaves defendants secure knowing they need only conform their baseline services to the laws of their home jurisdiction as long as any *geographically-tailored* services comply with local law. That is fair to the defendant, and fair to plaintiffs, as similarly-situated plaintiffs – wherever they may be located – would be treated the same.

*The Panel's Prioritization Prong Promotes Federalism*. Even more important than fairness is sovereignty, and the need to prevent States from exercising

23

authority beyond their borders. As this Court has explained, "due process limitations on suits against non-residents have their roots largely in our constitutional federalism and the resultant sovereignty of states." *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1272 (9th Cir. 1981).

At issue here is which States are entitled to regulate the internet. By its terms, the panel's decision only applies to "universally accessible" platforms where the "website itself is the only [pertinent] jurisdictional contact." *Shopify*, at 418. If more than one State can regulate a given platform, that platform will either no longer be "universally accessible" – that is, the internet will become balkanized – or it will have to comply with the most restrictive State's regulation. Either way, the world of a free, open, and universally accessible internet would come to an end.

Horizontal federalism precludes States from regulating universally accessible, *non-resident* platforms because doing so encroaches on the regulatory authority of both at-home States and those States who desire a more permissive regime. As the Supreme Court explained, "principles of state sovereignty and comity forbid a State to enact policies for the entire Nation, or to impose its own policy choice on neighboring States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 559 (1996). The territorial allocation of authority among the States is both pragmatic and democratic. As one commentator explained,

> "If I am to know the law that governs an act or transaction, I must be able to identify, before I act, the ***one*** state empowered to govern. It is

24

no answer to say that I can usually comply with the more restrictive rule, because that eliminates the political authority of the more permissive state."

Douglas Laycock, *Equal Citizens of Equal and Territorial States*, 92 Colum. L. Rev. 249, 319 (1992).

A simple hypothetical makes the point. Suppose a State, wishing to return to the days of yore, bans the internet at its borders. No one questions a State's right to do that for resident internet platforms: general jurisdiction means the State can do as it pleases so far as "minimum contacts" are concerned. But what about everyone else? Every non-resident internet platform – and every website *in the world* – would now need to develop geo-location capabilities to block in-state residents from accessing those sites. Large profitable sites may have the resources to do that. But less financially stable ones would have to shut down, depriving citizens in more permissive States of their benefits.[9]

The Supreme Court's decision in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011), precludes that result. There, the Court "rejected" the argument that "fairness and foreseeability" were the only interests guarded by the Due Process

---

[9] Jurisdictional rules and the Dormant Commerce Clause are motivated by the same federalism principles. *See Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1982) ("Limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, any attempt … to assert extraterritorial jurisdiction … would offend sister States.").

Clause, explaining that "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign analysis" to determine if "the sovereign has the **power** to subject the defendant to judgment." *Id*. at 883-84. If a "State were to assert jurisdiction in an inappropriate case," the Court explained, "it would upset the federal balance of power, which posits that each State has a sovereignty that is not subject to unlawful intrusion by other States." *Id*.

This principle resolves this case. By requiring forum-specific conduct beyond the baseline conduct of simply offering a universally accessible internet service, the panel has preserved state sovereignty. States may regulate any state-specific conduct, but only Congress or home States may set the baseline.

## CONCLUSION

For the foregoing reasons, this Court should adopt the panel's two-part personal jurisdiction test for universally accessible internet platforms.

Dated:  August 2, 2024           Respectfully submitted,

*/s/ Colin Kass*
Colin Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
T:  202-416-6800
ckass@proskauer.com

David A. Munkittrick
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
T:  212-969-3000
dmunkittrick@proskauer.com

*Attorneys for Amicus Curiae*
*Bright Data, Ltd.*

<u>**CERTIFICATE OF COMPLIANCE**</u>

I hereby certify pursuant to Rules 29, 32(a)(5)-(6), of the Federal Rules of Appellate Procedure that this *amicus* brief complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3). I further certify that the foregoing brief is proportionally spaced, has a typeface of 14 points Times New Roman, and contains 6,153 words, excluding those sections exempted from the type-volume limitation by Rule 32(f).

Dated: August 2, 2024

<div style="margin-left:auto;">

*/s/ Colin Kass*
Colin Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
T: 202-416-6800
ckass@proskauer.com

*Attorney for Amicus Curiae*
*Bright Data, Ltd.*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 2, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  August 2, 2024

<div style="text-align:right">

*/s/ Colin Kass*
Colin Kass
PROSKAUER ROSE LLP
*Attorney for Amicus Curiae*
*Bright Data, Ltd.*

</div>