No. 22-15815

In the United States Court of Appeals
for the Ninth Circuit

BRANDON BRISKIN,
ON BEHALF OF HIMSELF AND THOSE SIMILARLY SITUATED,
*Plaintiff-Appellant*,

v.

SHOPIFY INC., ET AL.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:21-cv-06269-PJH
The Honorable Phyllis J. Hamilton

**BRIEF OF *AMICI CURIAE* ALAN TRAMMELL AND DEREK BAMBAUER
IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

David Kramer
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304-1050
(650) 493-9300

Paul N. Harold
WILSON SONSINI GOODRICH & ROSATI
1700 K Street, N.W.
Washington, DC 20006
(202) 973-8800

Fred A. Rowley, Jr.
WILSON SONSINI GOODRICH & ROSATI
953 East Third Street, Suite 100
Los Angeles, CA 90013
(323) 210-2900
fred.rowley@wsgr.com

*Counsel for Amici Curiae Alan Trammell and Derek Bambauer*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................... 1

INTRODUCTION ............................................................................... 1

BACKGROUND .................................................................................. 4

ARGUMENT ...................................................................................... 5

I.    The exercise of personal jurisdiction should be informed by first principles, whether or not involving claims arising out of conduct on the internet. ............................................................... 5

    A.    The exercise of personal jurisdiction should be nonarbitrary, predictable, and fair. .............................. 5

    B.    Informed by these principles, the Supreme Court's specific jurisdiction doctrine has required a sufficient connection between the lawsuit and the litigation forum to justify the exercise of jurisdiction. ......................... 11

II.    The Court should take a cyber-realist approach in assessing whether to exercise specific jurisdiction over internet-based activity. ................................................................................. 12

    A.    The challenges presented by internet-based contacts actually flow from the indeterminate locus of intangible harms. ........................................................................ 12

    B.    Courts should dispense with the fiction that purely virtual conduct creates any meaningful contact with a particular forum. ...................................................................... 16

III.    Under this approach, the Court should decline to exercise specific jurisdiction over Shopify. ...................................... 21

CONCLUSION .................................................................................. 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

## CASES

*AMA Multimedia, Ltd. Liab. Co. v. Wanat*,
    970 F.3d 1201 (9th Cir. 2020) ...................................................................14

*Briskin v. Shopify, Inc.*,
    87 F.4th 404 (9th Cir. 2023) ...........................................................................5

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*,
    582 U.S. 255 (2017) .................................................................................6, 11, 18

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) .............................................................................8, 9, 11

*Calder v. Jones*,
    465 U.S. 783 (1984) ...........................................................................15, 17

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ...........................................................................18, 25

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021) .......................................................................................5

*Hanson v. Denckla*,
    357 U.S. 235 (1958) .................................................................11, 20, 23

*Herbal Brands, Inc. v. Photoplaza, Inc.*,
    72 F.4th 1085 (9th Cir. 2023) ...............................................................14, 23

*Hess v. Pawloski*,
    274 U.S. 352 (1927) .....................................................................................13

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) .......................................................................................7

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ...........................................................................8, 10, 11

*J. McIntyre Mach., Ltd. v. Nicastro*,
    564 U.S. 873 (2011) .......................................................................................6

*Johnson v. Arden*,
    614 F.3d 785 (8th Cir. 2010) ............................................................12

*Johnson v. TheHuffingtonPost.com, Inc.*,
    21 F.4th 314 (5th Cir. 2021) ...........................................................12

*Kulko v. Superior Ct. of California In & For City & Cnty. of S.F.*,
    436 U.S. 84 (1978)....................................................................13, 19

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023)........................................................................20

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
    647 F.3d 1218 (9th Cir. 2011) .......................................12, 14, 23

*Milliken v. Meyer*,
    311 U.S. 457 (1940)....................................................................8, 11

*Picot v. Weston*,
    780 F.3d 1206 (9th Cir. 2015) ......................................................21

*Ruhrgas AG v. Marathon Oil Co.*,
    526 U.S. 574 (1999)..........................................................................7

*Shaffer v. Heitner*,
    433 U.S. 186 (1977)........................................................................20

*UMG Recordings, Inc. v. Kurbanov*,
    963 F.3d 344 (4th Cir. 2020) .......................................................12

*Walden v. Fiore*,
    571 U.S. 277 (2014).........................................................17, 21, 23

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)..........................................5, 6, 7, 9, 12, 13

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*,
    952 F. Supp. 1119 (W.D. Pa. 1997) .................................12, 13, 14

iv

## CONSTITUTIONAL PROVISION AND STATUTE

U.S. Const. amend. XIV ....................................................................7, 10

47 U.S.C. § 230................................................................................24

## OTHER AUTHORITIES

Derek Bambauer, *Target(ed) Advertising*, 58 U.C. Davis L. Rev.
(forthcoming 2024),
https://scholarship.law.ufl.edu/cgi/viewcontent.cgi?article=226
0&context=facultypub ....................................................................24

David R. Johnson & Davis Post, *Law and Borders - The Rise of Law
in Cyberspace*, 48 Stan. L. Rev. 1367 (1996) ...............................16

Stephen Sachs, Pennoyer *Was Right*, 125 Texas L. Rev. 1249 (2017) ....................9

Alan M. Trammell & Derek E. Bambauer, *Personal Jurisdiction and
the "Interwebs,"* 100 Cornell L. Rev. 1129 (2015) .......................1

Peter K. Yu, *A Hater's Guide to Geoblocking*, 25 B.U. J. Sci. & Tech.
L. 503 (2019) .................................................................................19

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

Alan Trammell is Associate Professor of Law at Washington and Lee School of Law.  He writes and teaches in the areas of civil procedure, federal jurisdiction, and conflict of laws.  Derek Bambauer is the Irving Cypen Professor of Law at the University of Florida Levin College of Law, where he writes and teaches in the areas of Internet law, cybersecurity, and intellectual property.  Their scholarship includes the co-authored article, *Personal Jurisdiction and the "Interwebs"*.  *See* Alan M. Trammell & Derek E. Bambauer, *Personal Jurisdiction and the "Interwebs,"* 100 Cornell L. Rev. 1129 (2015).  *Amici* have an interest in the proper interpretation of the jurisdiction of the federal courts, including the application of fair, predictable, and efficient rules for the exercise of personal jurisdiction.

## INTRODUCTION

For over two decades, courts have grappled with the challenge of applying personal jurisdiction precedents and rules to internet-based activities.  The advent and development of the internet have reshaped our lives and the lawsuits brought in our courts, which increasingly center on online businesses and activities.  These internet-based suits have tested the limits and adequacy of personal jurisdiction rules

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), *amici* certify that no person or entity, other than *amici* or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.  All parties have consented to the filing of this brief.

developed for a more tangible world. As this case itself illustrates, courts often tie themselves in knots over internet-based contacts because they have failed to recognize the critical difference between physical harm and intangible harm. Most jurisdictional rules evolved to account for physical harms with an identifiable locus: injuries from car accidents, defective products, and the like. But when a plaintiff claims an intangible injury, like reputational harm from a defamatory article, it is often unclear where the injury occurred—was it where the article was published, where others read it, or where the plaintiff lives?

The indeterminate locus of intangible injuries is magnified in cases arising out of online commerce and activities, the plaintiff is generally claiming an intangible harm, whether it be reputational harm from a defamatory blog post, improper data collection by a social medial platform, or a violation of an online business's terms of service. These harms have no obvious physical locus; they could just as easily be said to have taken place where the plaintiff used the internet, the place where the defendant operated its business, somewhere within the relevant service provider's network, or somewhere along the internet highway. When a plaintiff claims such intangible, internet-based harms, traditional personal jurisdiction tests and frameworks often leave courts guessing at whether the defendant has meaningful contacts with the plaintiff's chosen forum.

A return to first principles—concerns for nonarbitrariness, fairness, and predictability—should guide the assessment of personal jurisdiction in the digital age. Informed by these principles, courts should take a narrow approach when dealing with intangible harm, whether that is a purely virtual harm (such as the privacy injury flowing from an online platform's allegedly improper collection of data about its users) or even a traditional intangible harm (such as the reputational injury flowing from a defamatory newspaper article). Courts should no longer indulge the fiction that virtual activity leading to a claimed intangible harm creates physical contact with any particular forum. Dispensing with that fiction undoubtedly will limit where a plaintiff can sue for intangible harm, but it will create a more predictable, coherent, and workable doctrine.

Applying that approach here, the Court should decline to exercise personal jurisdiction. The conduct at issue, Plaintiff admits, was "purely virtual." Briskin Supplemental Brief ("Briskin Supp. Br.") 12, Dkt. 66. Shopify's back-end online shopping and payment services did not create a contact with California merely because Briskin made a purchase over the internet with a merchant who used those services. What is more, this case well illustrates the dangers of treating virtual conduct as relevant contact with a particular forum. Jurisdiction should not turn on the arbitrary and largely unpredictable fact of where a person is when they complete an online transaction.

## BACKGROUND

Defendants Shopify Inc., Shopify (USA) Inc., and Shopify Payments (USA) Inc. (collectively, "Shopify") provide back-end, business-to-business, e-commerce services, including check-out and payment processing services to online merchants. *See* 1-ER-95-99. As alleged in the operative complaint, these companies are incorporated and have their principal place of business in either Canada or Delaware. 1-ER-95 (alleging that Shopify Inc. is incorporated and headquartered in Canada); 1-ER-97 (alleging that Shopify (USA) Inc. is incorporated in Delaware and headquartered in Canada); 1-ER-97 (alleging that Shopify Payments (USA) is incorporated and headquartered in Delaware). They provide services to merchants across the United States, approximately 8% of which are in California.

Plaintiff Brandon Briskin is a California resident who, while in California, used his iPhone to buy clothing from the website of an online merchant, IABMFG. 1-ER-95; 1-ER-113. Like millions of other online merchants, 1-ER-99, IABMFG had contracted with Shopify to help facilitate its online shopping and payment processing experience, 1-ER-95. Briskin alleges that Shopify, while providing these services, improperly collected and used his sensitive personal information, which impinged on his privacy rights in violation of the California Constitution, California statutes, and California common law. *See* 1-ER-119-138.

4

Briskin filed suit in California, arguing that California courts have personal jurisdiction over Shopify.  *See* 1-ER-95-99 (Briskin's allegations concerning personal jurisdiction).  The district court dismissed Briskin's complaint for lack of personal jurisdiction.  1-ER-12.  A panel of this Court unanimously affirmed. *Briskin v. Shopify, Inc.*, 87 F.4th 404 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 101 F.4th 706 (9th Cir. 2024).

## ARGUMENT

### I.   The exercise of personal jurisdiction should be informed by first principles, whether or not involving claims arising out of conduct on the internet.

The core principle driving personal jurisdiction doctrine is that the exercise of state power should be predictable and fair, rather than arbitrary.  This principle is formally rooted in limits on sovereign power and in protections for defendants against the arbitrary assertion of governmental force.  *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 360 (2021) (personal jurisdiction "rules derive from and reflect two sets of values—treating defendants fairly and protecting 'interstate federalism'" (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980)).

### A.   The exercise of personal jurisdiction should be nonarbitrary, predictable, and fair.

One facet of nonarbitrariness is an underlying concern about state sovereignty. The Supreme Court has, at times, invoked concerns about "interstate federalism,"

*World-Wide Volkswagen*, 444 U.S. at 293, and "sovereign authority," *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011) (plurality op.), as informing personal jurisdiction doctrine.  Under this line of reasoning, recognizing limits on a State's jurisdiction is necessary to "remain faithful to the principles of interstate federalism embodied in the Constitution." *World-Wide Volkswagen*, 444 U.S. at 293. The Framers foresaw and desired "[t]he economic interdependence of the States," a "common market," and "a 'free trade unit' in which the States are debarred from acting as separable economic entities."  *Id.*  At the same time, the Framers intended States to "retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts."  *Id.*

A State's sovereignty "implied a limitation on the sovereignty of all of its sister States." *Id.*  If a "State were to assert jurisdiction in an inappropriate case, it would upset the federal balance, which posits that each State has a sovereignty that is not subject to unlawful intrusion by other States."  *J. McIntyre Mach.*, 564 U.S. at 884 (plurality opinion).  "And at times, this federalism interest may be decisive." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 263 (2017).  Viewed through the lens of these sovereignty concerns, state boundaries do not simply serve as a proxy for the convenience of the parties, but rest on fundamental notions of governmental and judicial power.

In crafting personal jurisdiction rules, the Supreme Court has also drawn on concerns about protecting defendants from the unpredictable or arbitrary exercise of government power. In this vein of precedent, the Court has explained that "[t]he personal jurisdiction requirement recognizes and protects an individual liberty interest." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Personal jurisdiction, in this view, "'represents a restriction on judicial power ... as a matter of individual liberty.'" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (quoting *Ins. Corp. of Ireland*, 456 U.S. at 702).

The Supreme Court has long identified the Due Process Clauses as the constitutional source of these limits and protections. *See, e.g.*, *World-Wide Volkswagen*, 444 U.S. at 293 (locating the limits on a State's jurisdiction as "express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment"); *Ins. Corp. of Ireland*, 456 U.S. at 702 (opining that "[t]he requirement that a court have personal jurisdiction flows … from the Due Process Clause"). Indeed, the Court has even characterized the interstate federalism concerns informing the limits on personal jurisdiction as "ultimately a function of the *individual* liberty interest" that the Due Process Clauses safeguard. *See Ins. Corp. of Ireland*, 456 U.S. at 702, n.10 (emphasis added).

At least since *International Shoe*, the Supreme Court has made predictability and fairness concerns the touchstone for whether a defendant has sufficient ties to a

forum State to invoke jurisdiction. In *International Shoe Co. v. Washington*, the Court introduced the "minimum contacts" standard, fundamentally shifting the focus from rigid territoriality to a more nuanced inquiry into the "nature and quality" of a defendant's connections with the forum State. *See* 326 U.S. 310, 316, 319 (1945). This standard was designed to ensure that defendants could reasonably anticipate where they might be required to defend a lawsuit, thereby providing a measure of predictability in interstate commerce. The Court has consistently underscored the importance of fairness in this context, asserting that the exercise of jurisdiction must not violate "'traditional notions of fair play and substantial justice.'" 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). This emphasis on fairness aims to protect defendants from being haled into court in jurisdictions with which they have only tenuous or passing connections, thus preventing undue burdens and ensuring a just legal process.

Over the past several decades, the Supreme Court has continued to refine the test for personal jurisdiction, always with a view to ensure predictability and fairness. The Court elaborated on the "minimum contacts" standard, focusing on purposeful availment and the foreseeability of being sued in the forum State. *See, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985) (reasoning that while the defendant franchisee had no physical ties to the forum State, the franchise dispute at issue "grew directly out of 'a contract which had a *substantial* connection

with that State'"); *World-Wide Volkswagen*, 444 U.S. at 297 (explaining that the "foreseeability that is critical to due process analysis is …. that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there"). These developments balance States' interests in providing a forum for their residents with the need to protect non-resident defendants from arbitrary or unjust exercises of jurisdiction. *See Burger King*, 471 U.S. at 477. "By requiring that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign,'" the Court has reasoned, "the Due Process Clause 'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Id.* at 472 (internal citations omitted).

In constitutionalizing personal jurisdiction doctrine, the Supreme Court built upon the original meaning of the Due Process Clause, using fairness principles to strengthen common-law principles of jurisdiction. *See generally* Stephen Sachs, Pennoyer *Was Right*, 125 Texas L. Rev. 1249 (2017). At the time of the Founding, personal jurisdiction mattered most for recognition of judgments. Rather than litigate in a distant forum, a defendant would wait to contest the judgment when the plaintiff attempted to enforce the judgment in his home forum. *Id.* at 1273-80. In

that event, "foreign" judgments were held to international standards—which were part of the law of nations and the general law. *Id.* at 1253, 1270.

The Fourteenth Amendment provided a new basis for challenging the judgment. A judgment without jurisdiction was void, making its execution a deprivation of liberty or property without due process of law and a matter of federal constitutional concern. *Id.* at 1306-07. Now defendants could raise personal jurisdiction directly—and expect state courts to conform to the general law as applied by federal courts, on pain of reversal. *Id.* at 1307-11. But general, common law principles—not federal law in the form of due process doctrine—still governed whether the judgment was valid. *Id.*

Returning to this general-law approach would not require resetting personal jurisdiction doctrine to 19th century standards. *See id.* at 1319-1321. General law changes over time. Today, there is every reason to believe that these general law principles would be grounded in fundamental fairness—the heart of *International Shoe* and modern personal jurisdiction doctrine. To the extent the current jurisprudence does not reflect the Due Process Clause's original meaning, the solution would be to treat personal jurisdiction rules as part of the evolving common law. As common law rules, they would be amenable to revision by Congress, rather than trapped in constitutional amber. But given current precedent, that reenvisioning of personal jurisdiction doctrine can be accomplished only by the Supreme Court.

10

**B.** **Informed by these principles, the Supreme Court's specific jurisdiction doctrine has required a sufficient connection between the lawsuit and the litigation forum to justify the exercise of jurisdiction.**

The Supreme Court has distilled fundamental principles of fairness and predictability into the specific jurisdiction framework that should govern this case: a court can exercise personal jurisdiction over a defendant if the defendant has "minimum contacts" with the forum—contacts "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken*, 311 U.S. at 463).

Under the minimum contacts framework, the exercise of specific jurisdiction must satisfy three elements. First, a defendant must "purposefully avail[] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), or "'purposefully direct[]' his activities" at the State, *Burger King*, 471 U.S. at 472 (citation omitted). Second, "[i]n order for a state court to exercise specific jurisdiction, 'the *suit*' must 'arise out of or relate to the defendant's contacts with the *forum*.'" *Bristol-Myers Squibb*, 582 U.S. at 262. Third, the exercise of personal jurisdiction must be fundamentally fair and reasonable—that is, it must "comport with 'fair play and substantial justice,'" *Burger King*, 471 U.S. at 476, considering factors such as "'the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and

11

effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the States' "shared interest … in furthering fundamental substantive social policies," *World-Wide Volkswagen*, 444 U.S. at 292.

## II. The Court should take a cyber-realist approach in assessing whether to exercise specific jurisdiction over internet-based activity.

Courts have struggled to apply these principles to cases involving online conduct. One response has been internet exceptionalism, i.e., crafting special rules for cyberspace, most notably the *Zippo* test. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). That approach does not serve personal jurisdiction's first principles and misidentifies what makes these cases difficult: the intangible nature of the harm.

### A. The challenges presented by internet-based contacts actually flow from the indeterminate locus of intangible harms.

Courts have struggled to apply the test for specific jurisdiction over claims arising out of conduct over the internet. The *Zippo* test, which this Court has sometimes "followed," *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1227 (9th Cir. 2011), exemplifies this confusion.[2] The *Zippo* test seeks to discern a Web site's contacts and purposeful availment by measuring "commercial nature"

---

[2] Other circuits have also relied on *Zippo*. *E.g.*, *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 318 (5th Cir. 2021); *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020); *Johnson v. Arden*, 614 F.3d 785, 796 (8th Cir. 2010).

and "level of interactivity." *Zippo Mfg. Co.*, 952 F. Supp. at 1124. A "passive []

site" would not be enough to justify jurisdiction, but conducting sales over the

internet would be. *Id.* Between those two poles, a website's activities justify the

exercise of jurisdiction the more it reflects greater "interactivity," and thus a greater

exchange of commercial information with consumers. *Id.*

*Zippo*'s criteria bear no obvious relationship to the underlying normative

principles of personal jurisdiction doctrine and theory. First, equating a site's

commercial nature with purposeful availment is both over- and under-inclusive. The

commercial nature of an interaction may capture activities that, while business-

related, generate no meaningful contacts with the forum State, while overlooking

meaningful non-business contacts. *See Kulko v. Superior Ct. of California In & For

City & Cnty. of San Francisco*, 436 U.S. 84, 97 (1978) (treating the in-forum car

accident at issue in *Hess v. Pawloski*, 274 U.S. 352 (1927) as an example of

purposeful availment, even though the accident was not commercial in nature);

*World-Wide Volkswagen*, 444 U.S. at 295-99 (explaining that a defendant's

commercial gains from a product's use in the forum does not, standing alone, justify

exercising jurisdiction). Second, a site's interactivity is a poor proxy for whether a

defendant has purposefully availed itself of the benefits and protections of a State.

For example, web services like search engines are highly interactive, but expressly

not linked to geography. Finally, the *Zippo* test itself functions poorly because it is

13

either redundant in cases that long-standing doctrine easily resolves or unworkable in cases that demand a more nuanced analysis. Under any conception of minimum contacts, e-commerce sellers are uncontroversially haled into court in the States where they have transacted business and those transactions give rise to the lawsuit in question, whereas passive websites are little more than virtual billboards. The hard cases are in the middle of *Zippo*'s spectrum—where *Zippo*'s touchstones of commercial nature and interactivity provide the least guidance.

This Court has paid lip service to *Zippo* in its specific jurisdiction analysis, incorporating *Zippo*'s insights while requiring "something more"—"conduct directly targeting the forum"—to justify the exercise of jurisdiction. *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1091 (9th Cir. 2023). While the Court has characterized its cases as having "followed" *Zippo*, *Mavrix*, 647 F.3d at 1227, the Court's actual analysis has more often resembled the standard purposeful availment methodology, *see, e.g.*, *AMA Multimedia, Ltd. Liab. Co. v. Wanat*, 970 F.3d 1201, 1209 (9th Cir. 2020). This Court should continue to eschew *Zippo*'s approach and focus on the heart of the inquiry—purposeful availment.

Much of the difficulty in applying personal jurisdiction's first principles to internet-based claims flows not from the nature of the internet, but rather from the intangible nature of the harm. Even before the advent of the internet, courts struggled to identify the locus of intangible harms resulting from indirect or remote

activities. For example, in the defamation context, where does one's reputation exist and where does the plaintiff suffer the reputational harm? That question vexed the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984).

The claim in *Calder* arose from a defamatory article published in a nationally distributed tabloid newspaper. The victim, a television and Broadway actress, sued in California. *Id.* at 784. The tabloid and the defendant employees were based in Florida. *Id.* at 785. The Supreme Court approved the exercise of jurisdiction in California, reasoning that the actress's reputation was based in California (since her professional community was there) and the defendants knew the actress was a California resident famous in that State. *Id.* at 788-90. But that same analysis could support jurisdiction outside California—such as New York, where the victim was a prominent Broadway actress—because reputations are intangible and may exist in multiple locations. Moreover, the harm was inflicted by something intangible: the defamatory information in the article.

These intangible aspects of the plaintiff's claimed injury, and its connection to the defendant's actions, make jurisdiction far less predictable for defamation defendants. Because these defendants cannot control where information goes, they face greater uncertainty over where reputational harms may be suffered.

These challenges are magnified in the context of intangible harms allegedly suffered online, because "events on the Net occur everywhere, but nowhere in

particular." David R. Johnson & Davis Post, *Law and Borders - The Rise of Law in Cyberspace*, 48 Stan. L. Rev. 1367, 1376 (1996).   Take for example, a lawsuit alleging that a defendant business made unauthorized use of a copyrighted image in marketing emails to potential customers.   Is the locus of the copyright owner's intangible injury where the owner resides or happens to be when the infringement occurs?  Is it where the defendant runs its online activities?  Is it where the email recipients reside or happened to be when they received the emails?  Is it somewhere along the vast network of communications that make up the internet? There is no straightforward answer.

### B. Courts should dispense with the fiction that purely virtual conduct creates any meaningful contact with a particular forum.

The idea that virtual activity and harm create contacts with a particular territory is a fiction at odds with personal jurisdiction's first principles.   Unlike physical torts that have discrete locations, intangible interests and harms, while real, are too indeterminate to provide sufficient fairness and predictability.  Traditional personal jurisdiction principles are grounded in the physical presence and direct interactions of defendants within a forum State, ensuring that the assertion of jurisdiction is both foreseeable and just.  By contrast, virtual interactions between consumers and businesses lack the tangible, localized presence that these principles assume.   This disconnect highlights the fundamental inadequacy of applying traditional jurisdictional concepts to the digital realm, where a consumer's

engagements or transactions with a business are diffuse and often untraceable to specific geographic locations.

Under current Supreme Court precedent, this Court is free to reject the fiction that virtual activity alone can establish sufficient contacts for personal jurisdiction. In *Walden v. Fiore*, the Court limited the reach of *Calder* and explicitly left "questions about virtual contacts for another day," suggesting an openness to reevaluating the application of traditional jurisdictional standards to internet-based conduct. *See* 571 U.S. 277, 289-90 & n.9 (2014). This Court should seize the opportunity to address these unresolved questions by rejecting the notion that virtual activities and intangible harms create meaningful jurisdictional contacts. Doing so would realign personal jurisdiction doctrine with its foundational principles, promoting a more coherent and predictable legal framework for assessing jurisdiction in the digital age.

Rejecting this fiction best furthers personal jurisdiction's first principles. It enhances predictability by providing clear, consistent rules for determining jurisdiction. Rather than expending time and resources litigating thorny questions of specific jurisdiction based on online interactions that lack a definite locus, parties can rely on the more straightforward concept of general jurisdiction. General jurisdiction offers "at least one clear and certain forum" in which to bring their lawsuits, typically the defendant's domicile, place of incorporation, or principal

place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). General jurisdiction also guarantees large groups of plaintiffs a place where they can sue together as part of a mass action or class action. *See Bristol-Myers Squibb*, 582 U.S. at 268 (noting that the lack of specific jurisdiction "does not prevent … plaintiffs from joining together in a consolidated action in the States that have general jurisdiction"). This clarity allows for more efficient legal proceedings and reduces the uncertainty and expense associated with jurisdictional disputes.

Focusing on general jurisdiction not only creates certainty but also enhances fairness. The traditional burdens of travel, which are a significant consideration in the fairness analysis, are mitigated in today's interconnected world. Travel is less burdensome than in the past, and many courts now permit parties to take remote depositions, to appear remotely for routine hearings, or even to offer testimony by remote means. Moreover, the total burden of travel will likely remain constant regardless of jurisdictional rules, as either the plaintiff or the defendant must travel to the forum. Additionally, access to evidence, another key aspect of the fairness analysis, is unlikely to be impeded by a focus on general jurisdiction. In the digital age, much of the relevant evidence in internet-related disputes is electronically stored and can be accessed remotely, minimizing logistical challenges.

Larger societal interests, which also weigh in the fairness analysis, have crystallized in the internet context to favor the unfettered exchange of information.

A narrower approach to personal jurisdiction accords with how the United States has approached internet liability questions more generally, which generally promotes the free flow of information and predictable rules limiting liability of internet intermediaries. This pro-internet approach serves distinctly utilitarian ends: reducing the chilling effect that wide-ranging and effectively nationwide liability may have on the development of new internet services. Society is not well-served by a balkanized, "geoblock[ed]" internet of the kind Briskin envisages. *See* Briskin Supp. Br. 16 (citing Peter K. Yu, *A Hater's Guide to Geoblocking*, 25 B.U. J. Sci. & Tech. L. 503, 504 (2019)). By rejecting the fiction that virtual activity alone can establish personal jurisdiction, courts can help create a legal environment that supports technological innovation and economic growth while safeguarding the due process rights of individuals and businesses.

Such an approach would not unreasonably restrict legitimate state regulatory interests. Some *amici* argue that interests of "sovereignty or comity" counsel in favor of an approach that would permit state attorneys general to enforce state laws in the State's courts. *See* Brief of Nevada, et al., as *Amici Curiae* at 17, Dkt. 73. As an initial matter, States do not have an overriding interest in bringing suit in their own courts. While States may have an interest in seeing their substantive law applied in appropriate cases, that alone cannot justify jurisdiction over out-of-state residents. *See, e.g.*, *Kulko*, 436 U.S. at 98 ("[W]hile the presence of the children and one parent

in California arguably might favor application of California law in a lawsuit in New York, the fact that California may be the 'center of gravity' for choice-of-law purposes does not mean that California has personal jurisdiction over the defendant.") (some internal quotation marks omitted); *Shaffer v. Heitner*, 433 U.S. 186, 215 (1977) ("[W]e have rejected the argument that if a State's law can properly be applied to a dispute, its courts necessarily have jurisdiction over the parties to that dispute."); *Hanson*, 357 U.S. at 254 ("The issue is personal jurisdiction, not choice of law."). More fundamentally, it is far from obvious which state should have the power to regulate conduct on the internet. Determining how to navigate states' competing regulatory interests presents a thorny problem—and one whose implications stretch far beyond the doctrine of personal jurisdiction.

As a practical matter, these concerns—whatever their merits—may be ameliorated by the Supreme Court's recent blessing of consent-by-registration statutes. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023). If States believe that an "internet-based company [that] conducts business" in the State should be subject to the jurisdiction of its courts, Brief of Nevada, et al., as *Amici Curiae* at 16, they may enact consent-by-registration statutes of the kind approved by *Mallory*.

In summary, embracing a framework that prioritizes general jurisdiction for internet-based conduct ensures both predictability and fairness, aligning personal jurisdiction doctrine with its first principles.

**III.    Under this approach, the Court should decline to exercise specific jurisdiction over Shopify.**

There is no dispute that the relevant conduct here is "purely virtual." Briskin Supp. Br. 12. And as much as Briskin tries to analogize Shopify's conduct to a physical act *in California*, Briskin Opening Brief 21, 25 (analogizing the alleged conduct to "physically plac[ing] a surveillance device at a cash register" and "install[ing] a physical surveillance device in a food truck"), it is not. To attribute the injury flowing from the allegedly improper collection and use of Briskin's personal information to California would be to indulge a fiction counter to personal jurisdiction's first principles.

Briskin claims that he was injured because Shopify surreptitiously processed and collected his information by facilitating his order from IABMFG. *See* Briskin Supp. Br. 1. Because he is a California resident, Briskin reasons, Shopify collected information from a California consumer, triggering specific jurisdiction. *Id.* But Briskin would suffer this same alleged harm, asserting the same liability theories, whether he purchased a product from IABMFG while in New York, Texas, Florida, or any other State—it "would follow him wherever he might choose to live or travel." *See Picot v. Weston*, 780 F.3d 1206, 1215 (9th Cir. 2015). Courts should not "impermissibly allow[ ] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis," *Walden*, 571 U.S. at 289, and jurisdiction should not turn on the arbitrary—and to Shopify, largely unpredictable—fact of where

Briskin happened to be when he placed his order. *See id.* In this respect, Briskin's claimed injury illustrates the arbitrariness of attributing intangible harms to a particular jurisdiction.

Briskin insists that Shopify's conduct was targeted at California, but not in any way that matters. Shopify's conduct was reactive. IABMFG chose to utilize the Shopify services. 1-ER-99 (alleging that merchants "can elect to embed certain Shopify assets … into their pre-existing websites"). Briskin chose to buy a product from IABMFG. 1-ER-113 (detailing Briskin's decision to purchase). Briskin's location was incidental to Shopify's services; Shopify would have collected his data regardless of where he resided. In this instance, then, Shopify happened to collect a California consumer's data, as opposed to data from consumers in other States, due entirely to the decisions and actions of Briskin and IABMFG. Briskin's choice to purchase a product from an online merchant that in turn chose to use Shopify as its e-commerce service provider should not subject Shopify to jurisdiction in California.

Briskin admits that when Shopify contracted with IABMFG to provide it services, Shopify was agnostic about where IABMG conducted business. Briskin Opening Brief 24 ("*Shopify*, however, chose to extract personal data from IABMFG's customers—wherever located—through the payment portal it created and maintained."). Shopify's agnosticism cuts against jurisdiction. "Due process requires that a defendant be haled into court in a forum State based on his own

affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *See Walden*, 571 U.S. at 286; *see also Hanson*, 357 U.S. at 253 ("[t]he unilateral activity" of third parties does not "satisfy the requirement of contact with the forum State.").

Briskin's approach poses special risks for online businesses. Shopify is a service provider that Briskin describes as a "platform." 1-ER-92; *see also* Briskin Supp. Br. 1. It offers neutral tools that merchants use to facilitate payment processing. *See* 1-ER-92. What customers do with it—or here, what Shopify's customer's customers do with it—determines whether harms occur or not and where. If a service provider's neutral tools for nationwide, if not global, online commerce were deemed an invitation to personal jurisdiction, it would destroy any meaningful limits on personal jurisdiction over online platforms and service providers. Any approach that would collapse the distinction between general and specific jurisdiction should be rejected. *See, e.g.*, *Herbal Brands*, 72 F.4th at 1091 (concluding that a rule subjecting website operators to jurisdiction in any forum where their website is visible "would be too broad to comport with due process"); *Mavrix*, 647 F.3d at 1227 (concluding that a rule that "would expose most large media entities to nationwide general jurisdiction" based on the availability of their websites in the forum State would "be inconsistent with the constitutional requirement[s]" for the exercise of general jurisdiction).

Additionally, subjecting Shopify to personal jurisdiction in California based on its location-blind provision of e-commerce services would imperil the open internet and risk undermining important privacy protections. Briskin contends that "[a] defendant like Shopify could choose to structure its operations such that it extracts, compiles, and monetizes data from transactions occurring" in one State but not another. Briskin Supp. Br. 16. It could accomplish this, Briskin argues, by geoblocking, i.e., determining the user's location and restricting access to content based on the user's location. *Id.* The upshot of Briskin's proposal is that service providers ought to control their liability exposure by limiting their interstate business operations and collecting *more* information about end-users.

Briskin's proposal for a balkanized internet is fundamentally inconsistent with the federal government's policy of promoting internet-based commerce and activity nationwide. *See, e.g.*, 47 U.S.C. § 230 (announcing "the policy of the United States … to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation" and preempting certain contrary state laws). Under Briskin's approach, websites would routinely be available in some States and unavailable in others. And back-end service providers, like Shopify here, might condition their services on online businesses blocking users in certain States.

Briskin's proposal also runs directly contrary to current trends in privacy law, which generally seek to regulate how online services collect and use data and to incentivize services to rely on deidentified or non-identifying information. *See generally* Derek Bambauer, *Target(ed) Advertising*, 58 U.C. Davis L. Rev. (forthcoming 2024). And it would force online services into a dilemma: remain agnostic about their users' locations and risk personal jurisdiction anywhere their service is used, or collect and monitor their users' locations and attract additional regulatory scrutiny and burdens.

While there is not, on the facts alleged, general or specific jurisdiction over Defendants in California, this does not mean that Briskin is left without recourse. Brisken may bring suit at least in any forum having general jurisdiction, such as Delaware, where both Shopify (USA) Inc. and Shopify Payments (USA) Inc. are incorporated, *see* 1-ER-97; Shopify Supplemental Brief 33 n.13, Dkt. 93, and therefore "may be sued on any and all claims." *Daimler AG*, 571 U.S. at 137.

## CONCLUSION

Current approaches to assessing personal jurisdiction in the context of the internet are not up to the task. By returning to first principles and rejecting the fiction that purely virtual conduct creates any meaningful contact with a particular forum, courts can better navigate the complexities of internet-based contacts, while ensuring fair, predicable, and just outcomes for all involved.

DATED: August 2, 2024

Respectfully submitted,

*/s/ Fred A. Rowley, Jr.*

David Kramer
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304-1050
(650) 493-9300

Fred A. Rowley, Jr.
WILSON SONSINI GOODRICH & ROSATI
953 East Third Street, Suite 100
Los Angeles, CA 90013
(323) 210-2900
fred.rowley@wsgr.com

Paul N. Harold
WILSON SONSINI GOODRICH & ROSATI
1700 K Street, N.W.
Washington, DC 20006
(202) 973-8800

*Counsel for Amici Curiae Alan Trammell and Derek Bambauer*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 22-15815

I am the attorney or self-represented party.

**This brief contains** | 5,821 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　☐ it is a joint brief submitted by separately represented parties.
　☐ a party or parties are filing a single brief in response to multiple briefs.
　☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [　　　　].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Fred A. Rowley, Jr. | **Date** | 8/2/2024

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 2, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 2, 2024                            By: */s/ Fred A. Rowley, Jr.*            
                                                          Fred A. Rowley, Jr.